Filed 1/28/14  P. v. Baskin CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244611 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA086624) |
| v. | |
| JEREMIAH BASKIN et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Jesse I. Rodriguez, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant Jeremiah Baskin.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Traveon Hill.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Jeremiah Baskin and Traveon Hill were convicted of attempted second degree robbery and second degree commercial burglary. Appellants were charged with the murder of accomplice Brandon Lincoln under the provocative act doctrine, but the jury found them not guilty of that charge. The jury found true the allegations that the burglary and attempted robbery were committed for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subd. (b)(1).[1] Appellant Hill admitted that he had suffered two prior serious felony convictions within the meaning of the Three Strikes law and section 667, subdivision (a), and that he had served a prior prison term within the meaning of section 667.5, subdivision (b). Appellant Baskin admitted that he had suffered a prior serious felony conviction within the meaning of the Three Strikes law and section 667, subdivision (a), and that he had served a prior prison term within the meaning of section 667.5, subdivision (b). The trial court sentenced appellant Baskin to a total term of 16 years in state prison and appellant Hill to a term of 30 years to life in state prison.

Appellants appeal, contending the trial court: made numerous improper and prejudicial remarks during jury voir dire; erred in instructing the jury on consciousness of guilt; and in denying the joint defense motion to bifurcate the trial on the gang enhancements. Appellants further contend there is insufficient evidence to support the true finding on the gang enhancements. Appellants also contend the prosecutor committed misconduct. Additionally appellants contend the trial court abused its discretion in denying their motions to strike their prior convictions for sentencing purposes. We affirm the judgments of conviction.

---

[1] Unless otherwise indicated, all future statutory references are to the Penal Code.

# I.  FACTS

## 1.  Prosecution's case

On August 18, 2010, a young man came into Arturo Rios's jewelry store twice to inquire about fixing a watch. Both Rios and his employee, Maria Gonzales, were suspicious of the young man and Gonzales worried that something bad might happen.

Later in the day, just before 6:00 p.m., the same man, Brandon Lincoln, came into the store with three other men.  Rios was sitting at a desk at the end of the store and Gonzales was cleaning showcases.  Lincoln entered the store quickly and pulled out an object from his waistband. Appellant Hill rushed toward Rios.  Hill also pulled out an object from his waistband.  One of these objects turned out to be a mallet-style hammer, but the way that the intruder moved led Rios to believe it was a gun.  A second hammer was recovered from the jewelry store after the shooting.  Appellant Baskin and the fourth man did not remove anything from their waistbands.

Rios heard loud "pops" which he later learned was the breaking of his store's glass showcases.  Rios believed the men were going to shoot him and Gonzales.  He was frightened.  Gonzales panicked and was concerned for her safety.  Rios stood up, pulled out his gun from his waist and fired it as appellant Hill was heading toward him.  He fired 15 bullets, hitting appellants and Lincoln.  Lincoln and appellant Hill crawled out of the store and the other two men fled.  Rios was still scared.  He reloaded his gun, fearing the men would return to shoot him.

Gonzales called 911.  Police found two hammers on the floor of the jewelry store. Gloves were also found near the crime scene.  Apart from Rios' gun, no other firearms were found at the crime scene.

The incident was recorded by a security camera on the premises.  The tape was played for the jury at trial.

Appellant Baskin, who had been shot three times and was bleeding heavily, went to Lincoln's home, which Lincoln shared with his aunt, Adrianne Hicks. Hicks and her neighbor, Delila Duran, took appellant Baskin to the hospital.

Police found Lincoln face down on the sidewalk in front of the store. He had been shot four times and was dead.

Appellant Hill was found across the street from the jewelry store, lying face down and bleeding. He was on the phone telling someone he had been shot in the store. Appellant Hill was severely injured by the gunshots but survived.

Swabs were taken of blood from inside the jewelry store and the sidewalk near Lincoln's home and were tested. The DNA on the swab from the store matched appellant Hill's DNA, and the DNA on the swab from the sidewalk matched appellant Baskin's DNA.

Three witnesses testified about appellants' gang affiliation. Detective Traci Gonzales of the Los Angeles County Sheriff's Department testified that in 2005, when she worked as a detective assigned to gang-related cases, she had contact with appellants. Both appellants had admitted to Detective Gonzales that they were members of the Santana Blocc gang.

Lincoln's neighbor Duran had known him since childhood. She knew that he was a member of the Santana Blocc gang. He was known as "Blocc Boy" and "Savage." Lincoln's home was a "hangout" for the Santana Blocc gang.

Detective Richard Sanchez of the Los Angeles County Sheriff's Department testified as a gang expert that the Santana Blocc Crips is a violent criminal gang in Compton. The common sign or symbol for the gang is "SBC" or "SBCC." The gang uses "Blocc," instead of "Block" for part of its name because the last two letters stand for "Compton Crip." Sometimes the "B" in the word "Blocc" is crossed out because the letter "B" stands for the rival Bloods gang.

Detective Sanchez testified that the primary activities of the Santana Blocc gang included petty thefts, narcotics sales, assaults with deadly weapons, burglaries, robberies,

4

attempted murders and murders. The types of robberies committed by gang members include robberies of jewelry stores.

Detective Sanchez had contact with both appellants. He heard them admit to being Santana Blocc gang members, with appellant Hill admitting to be a member in 2005, and appellant Baskin admitting to be a member in 2002. Detective Sanchez observed and photographed appellant Hill's tattoos. On his hands were tattooed the words "Blocc" and "Boy," signifying that he was claiming the Santana Blocc gang. Right above his wrist and forearm was a tattoo of a stack of $100 bills, which is a common gang tattoo called a money roll, signifying that the gang member is making a lot of money from illegal activities. The fingers on both his hands were tattooed with the numbers 5150, signifying that "they are crazy." One tricep was tattooed with the letter "S" for "Santana," and the other tricep was tattooed with the letter "B" for "Blocc." The front part of each shoulder was tattooed in the shape of a hand making a letter "C" gesture for "Compton Crip." Detective Sanchez opined that appellant Hill is an active Santana Blocc gang member. He also opined that appellant Baskin was a member of the Santana Blocc gang.

Based on a hypothetical scenario mirroring the evidence in the case, Detective Sanchez opined that the crimes were gang-related, committed at the direction of, in association with and for the benefit of Santana Blocc Compton Crip, a gang he described as "tight knit" with "a very tight alliance." Detective Sanchez unequivocally testified, "there is no doubt in my mind it was [at] the direction of Santana Blocc Compton Crip. [¶] They do it to gain profits. . . . They make the money, and, then, they turn that money into narcotics, which is easier to sell than the actual jewelry."


2. Defense case


Appellant Baskin offered two witnesses in his defense. Detective Freddy Arroyo of the Los Angeles Police Department, testified that on August 18, 2010, he interviewed Maria Gonzales in Spanish, a language in which he was fluent. Gonzales told Detective

5

Arroyo that she was present when the Rios Jewelry Store shooting occurred, and that she saw one of the young men earlier in the afternoon when he had come into the store. She had been at the front door of the store because she had been suspicious of the young man. Detective Arroyo asked Gonzales at least twice whether she saw the young men with any weapons, and each time she said she did not see any weapons.

Detective Matthew Maffei, also of the Los Angeles Police Department, testified that on August 18, 2010, he was asked to help in an investigation of a shooting at the Rios Jewelry store. At the store, Rios told Detective Maffei that he shot the suspects who came into his jewelry store because he was afraid they would shoot him. Detective Maffei took Rios to the park across the street from the jewelry store. At the park, Rios positively identified appellant Hill.

Appellant Hill did not offer any evidence.

## II. DISCUSSION

### 1. Court's Comments during Voir Dire

Appellants contend the trial court made numerous improper and prejudicial comments to prospective jurors during voir dire. We consider each set of remarks in turn.

### a. Comments about terrorism and 9/11

Appellants contend the trial court made comments about terrorism and 9/11 which were in no way relevant to this matter and which were highly prejudicial.

6

i.  Proceedings below

During voir dire, the trial judge told the prospective jurors that he liked to use analogies.  The trial court said, "This analogy has nothing to do with this case. It is a hypothetical case.  Something that happened some years back."  The court then said, "Hypothetically speaking, hopefully it never happens again, but we have a terrorist attack on our nation and kills one or 2,300 people.  Last time I checked, I think about 98 to 99.7 of the 365 or 80 million people that we have would love be to [sic] the arresting officer, the jury, the judge and the executioner as to that terrorist that happened on our shores.  Nothing to do with this case.  But the issue becomes most of those same people would abhor—like I said, would be all of them at once in one coin, arresting officer, executioner, judge, jury, all of them at once, and then they pull the trigger against that terrorist when they are caught and tried.  But if the criteria is how much you despise that or you disagree with that terrorist—if the criteria was that and being a fair and impartial juror in that hypothetical situation, then that terrorist could never be tried in this country because, last time we checked, no one likes those people.  The question is irrespective of . . . whether you like something or not, the question is are you able to put that aside and say, yeah, I don't like this; I don't like that.  The question is[,] are you able to be fair and impartial in this case."

The court added:  "That's a further analogy that I gave you about Donald Trump giving me all that money.  The bottom line is irrespective of my likes or dislikes, can I be fair pursuant to my oath, pursuant to my morals and my ethics.  Simple as that."

ii.  The court's comments did not result in prejudice to appellants

As the trial court stated, a terrorist attack "has nothing to do with this case."  The court used the terrorism reference while explaining an easily understood concept to potential jurors:  It is a common reaction for a juror to not "like" a criminal defendant, but he or she must be able to set aside such a feeling in order to give the defendant a fair

7

trial. There was thus no reason to refer to a terrorist attack or to tell the prospective jurors that in the court's opinion virtually everyone in America would want to be the executioner of the terrorists.

The mention of 9/11 "continue[s] to invoke fear, dread and anger in the listener." (*People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1259-1260.) Given the continued emotional power of 9/11, we question whether there is ever a need in an ordinary criminal trial to refer to 9/11, directly or indirectly. There was clearly no need to do so in this case.

We find the error harmless under either the federal or state standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court's reference to terrorism was brief and not graphic. Jurors acquitted appellants on the most serious charge of murder, showing that they were not prejudiced by the court's comments and were able to fairly consider each charge on its merits. The evidence against appellants on the burglary and robbery charges was overwhelming. The robbery was videotaped and the recording shown to the jury. Appellant Hill was found across the street from the store and was overheard stating that he had been shot in the store. Lincoln's aunt and a neighbor testified that appellant Baskin came to Lincoln's house on the evening of the robbery seeking assistance for gunshot wounds he had suffered.

   b. Comments About Reasonable Doubt and the Burden of Proof.

Appellants contend the trial court inaccurately paraphrased the definitions for reasonable doubt and the burden of proof and the resulting error violated their due process rights and require reversal per se.[2]

---

[2] Both appellants claim the comments were improper. Each appellant makes some specific claims of impropriety in his brief that the other does not, but each joins in the other's contentions.

Respondent contends appellants forfeited their claims by failing to object to the trial court's remarks. (See *People v. Boyette* (2002) 29 Cal.4th 381, 459 [failure to object to trial court's disparaging remarks about expert witness waived claim of misconduct].) Appellants contend the trial court's remarks were the equivalent of a jury instruction. They point out that instructional errors which affect a defendant's substantial rights may be raised on appeal even in the absence of an objection in the trial court. (*People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7.)

We view the trial court's comments as closer to being instructions on the law than the sort of general comment considered by the Court in *People v. Boyette, supra,* 29 Cal. 4th at page 459. The trial court in fact read the prospective jurors the standard CALCRIM instruction on reasonable doubt. The rest of the court's comments were related to that instruction. Accordingly, we will review appellant's claim.

i. Proceedings below

During voir dire, the court read the definition of the legal term "reasonable doubt."[3] Afterward, the court told the prospective jurors, "Do not ask me to explain it to you because I will get in trouble. In deciding what is a reasonable doubt, that is between you and you and between you and the other jurors if you are selected; no more, no less."

---

[3] The court read the following out loud: "The fact that a criminal charge has been filed against the defendants is not evidence that the charge or charges is or are true. You must not be biased against the defendant because they have been arrested, charged with a crime or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge or charges is or are true. The evidence may not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he's entitled to an acquittal, and you must find him not guilty."

The trial court then explained that appellants are presumed innocent, even if they never say a word at trial, that the prosecution has the burden to prove the case to the jury beyond a reasonable doubt, and that "[t]he defense doesn't have to prove anything to you." The court further explained that appellants "don't have to call any witnesses. They don't have to ask a question. They don't have to stand up, nothing, theoretically speaking. And the burden remains with the prosecution, period. Like I always say, it is not a high burden. It is not a low burden. It is not . . . a medium burden. It is a burden that was established ad infinitum, sort of forever, period. We as judges have to accept it whether we like it or not."

The court reiterated the prosecution's burden of proof: "The People's burden is beyond a reasonable doubt. . . . It is not to prove the case to you perfect or a hundred percent. It doesn't exist. There's no perfect case. There's no case that anyone can prove a hundred percent."

"We see on television. We read the papers all—there are—I think last time I counted with all the different channels, there are like 300, 400 channels nowadays. Maybe a great percentage of them are crime programs, lawyer programs, police programs. So technological—you know, looking at all this, and everything is perfect down to the 10th trillionths of a trillionth of your hair. That's not real life at least as to the People's burden. Okay. Keep that in mind."

"Proof beyond a reasonable doubt. You don't go in there looking for a doubt because it is proof beyond a reasonable doubt. If you have a doubt as to the guilt or innocence here, then you have to decide is it reasonable or not because you could have doubts, but they must be reasonable. So you don't go in there already saying there is a doubt. Only if in your mind after you decide what the facts are, discuss the case, the facts with the other jurors, discuss the evidence, the exhibits, the law, and you have to decide. If I have a doubt, is it reasonable or not. If you don't have a doubt, that's it."

The trial court explained that jurors are not to speculate, and are to listen to the evidence. The court told the prospective jurors that the lawyers "prepared this case. They know the case better than you and I will know this case ever. They know whether

they have an obligation. They have a burden. They know where they're going in this case. They know what they need to do."

Toward the end of voir dire, when the trial court asked the prospective jurors collective questions, it explained the prosecution's burden of proof and the presumption of innocence: "In terms of the burden of proof; the People's obligation to prove the case and each element beyond a reasonable doubt against the defendants, the defendants' right not to testify—the lawyers don't have to prove anything to you. The defendants don't have to prove their innocence to you. They are presumed to be innocent. . . . This presumption can be overcome by the People through their witnesses and exhibits. Of course, that presumption remains until after you cross that threshold and go into the jury room to deliberate and determine what the facts are. You are not to consider penalty or punishment. You are not to speculate. You are not to be investigators. You are not to be partisans. You are not to be litigants. You are to be judges of the facts; no more, no less."

After the jurors were selected, one of them asked, "You're going to make sure that we understand the instructions and the law and everything[?] I want to do this right." The trial court answered, "I am convinced beyond any doubt whatsoever that all of you will do your job according to the law and according to your oath. The instructions—the law is the law. I read the law to you. [¶] Remember when I read that reasonable doubt that I told you don't ask me what it means because I'm going to get in big trouble. You don't want me to lose my job. [¶] Okay. Remember we are judges. We are judges. These are the attorneys, extremely professional people. They know what they are doing. . . . You don't have to worry about anything. . . ."

c. The trial court did not improperly paraphrase the law

A trial court errs when it explains or expands upon the concept of reasonable doubt in a manner which lowers the prosecution's burden of proof. (*People v. Johnson* (2004) 119 Cal.App.4th 976, 985-986.)

11

Appellants contend the trial court's comments were the same as those found improper in *People v. Johnson, supra*, 119 Cal.App.4th at pages 985-986, and *People v. Johnson* (2004) 115 Cal.App.4th 1169, and had the same effect. Appellants are mistaken.

In one of those cases, the trial court compared reasonable doubt to decisions jurors made in daily life, such as going to college, and argued that jurors could not come up with a decision in life made with "absolutely no doubt," and could not wait to be "convinced beyond all possible doubt" before making a decision because "it's never happened in your life[.]" (*People v. Johnson, supra*, 119 Cal.App.4th at p. 980.) In the other case, the court stated people plan future activities such as vacations because they "have a belief beyond a reasonable doubt that they will be here tomorrow." (*People v. Johnson, supra*, 115 Cal.App.4th at p. 1171.)

In both cases, the Court of Appeal found the comments erroneous because everyday activities do not require the same deliberative process as required for a jury trial and do not require an individual to have an abiding conviction of the wisdom of their conviction. That was not the case here. The court did not use everyday activities to explain or illustrate the concept of reasonable doubt.

Appellant Hill further contends the trial court improperly suggested to jurors that the meaning of beyond a reasonable doubt was up to them. He claims that while "at some point this is entirely true, a jury's determination of reasonable doubt necessarily depends on how it is defined." Appellant overlooks the fact that the trial court's remark came immediately after the court read the jury instruction defining reasonable doubt. Further, as we discuss throughout this section of the opinion, the trial court did not misstate the definition of reasonable doubt. Thus, appellant's claim fails.

Appellant Hill also contends the trial court erred in informing the prospective jurors that the People could establish reasonable doubt with a less than "perfect" case, "suggesting that evidentiary deficiencies were the norm, and not to expect a case to be prove to an exactitude." We do not agree. The court's comments were made in reference to television shows, and suggest only that trials in real life are not like trials on television. The court pointed out that television shows are "technological—you know, looking at all

12

this, and everything is perfect down to the 10th trillionths of a trillionth of your hair." The court's comments were consistent with the standard jury instruction on reasonable doubt, which states, "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

Appellant Hill additionally contends the court's comment to jurors that they not begin deliberations "looking for a doubt" suggests that the jury should not subject the prosecution's case to rigorous thinking. Appellant is mistaken. The court was telling the prospective jurors not to pre-judge the case. The rest of the court's statement was: "So you don't go in there already saying there is a doubt. Only if in your mind after you decide what the facts are, discuss the case, the facts with the other jurors, discuss the evidence, the exhibits, the law, and you have to decide. If I have a doubt, is it reasonable or not. If you don't have a doubt, that's it."

Appellant Baskin points to several phrases by the court which he claims were erroneous. Like appellant Hill, he points to the comments about a "perfect" case as misstating the reasonable doubt standard. As we discuss, *supra*, those comments were proper.

Appellant Baskin also contends the prosecutor compounded the court's error by also incorrectly paraphrasing the reasonable doubt instruction when he said: "What is beyond a reasonable doubt? It is exactly what the judge instructed. I can't say it is 52 percent or 99 percent. There is no number you can put on it. As the prosecutor in this case, it is my burden to prove the case to you if you are selected as jurors to prove the case to you beyond a reasonable doubt." Appellant does not elaborate on his claim. We see nothing incorrect in the prosecutor's statement. The prosecutor told the prospective jurors to follow the court's instruction, adding only that a number cannot be put on reasonable doubt. That is true.

Appellant Baskin further contends the trial court improperly paraphrased the burden of proof by using the phrases "it is not a high burden" and "presumption of innocence is not static." The phrases are taken out of context.

13

The court said in full: "[I]t is not a high burden. It is not a low burden. It is not . . . a medium burden." The court was explaining that the burden of proof standard was a complex concept, not easily explained by simple adjectives. That is true.

The court said in full: "The presumption of innocence is not static. It is not forever because that presumption can be overcome by the prosecution . . . ." This is clearly a correct statement of law. A defendant begins a case with the presumption of innocence, but that presumption can be rebutted by the prosecution.

Finally, appellant Baskin contends the trial court incorrectly suggested the defense had a burden when the court stated: "[T]hese lawyers, as I said, they prepared this case. They know the case better than you and I will know this case ever. They know whether they have an obligation. They have a burden." The court continued: "They know where they're going in this case. They know what they need to do. They know what they need to ask. It is a lot of tactical considerations in a trial."

In context, the court was telling the prospective jurors not to decide the case before they went into the jury room for deliberations. Before making the above remarks, the court told the prospective jurors: "When we're sitting here, as I said, we could be speculating, and you are sitting there saying I just wish Mr. Bengston would call this witness. Because in the meantime, from now until you cross that threshold there, you're not to speculate. You're not to form or express any opinions about the case." The court then reiterated that the prospective jurors should not speculate about why a person might not have been called as a witness, or a question was not asked. The court then made the above-quoted remark, which explains to jurors why they should not speculate. This was a proper statement of the law.

d. Appellants' right not to testify

Appellants contend that when the court told the prospective jurors "judges penalize defendants for not testifying," the court was somehow conveying to the prospective jurors that this was acceptable behavior.

14

i.  Proceedings below

The trial court initially told prospective jurors:  "In every criminal case, the person charged with a crime, . . . those people do not have to testify in a case in which they are a defendant. So Mr. Hill and Mr. Baskin—it is one of the most absolute things in criminal law, the right not to testify. . . ."

The court added:  "But the problem is that I'm going to give you a lot of instructions.  I'm going to give you a lot of admonitions.  I'm going to tell you to do some things, and I'm going to tell you a lot more things not to do.  But I realize that no matter how many instructions I will give to you in writing or orally, I cannot control your minds.  That's an understatement because, believe it or not, when I'm sitting, I cannot even control my own mind.  How would I expect to control yours?  But the guidelines that we give you, the admonitions that we give you to protect everyone's rights, including the People, are things that come into play sometimes.  And sometimes you may be sitting there, and unconsciously things come into your mind. . . ."

"Because of this area, it happens quite often that most jurors will tell us, if, if not all of them, yes, I accept the point of law that in a criminal case a defendant does not have to testify.  He has that absolute right.  What happens is that some of us start thinking about it and say why not.  And sometimes what happens is people penalize—judges penalize defendants for not testifying. . . . Can't do it. Can't do it."

"Why?  Because that is . . . the law.  That's what our forefathers say when they were founding our republic, democracy.  [Two], it is pursuant to your oath; [three], it is the only right thing to do because they do have a burden.  The burden is with the People; no more, no less."

ii.  The court did not convey approval of inferring guilt.

 "[T]he privilege against self-incrimination of the Fifth Amendment prohibits any comment on a defendant's failure to testify at trial that invites or allows the jury to infer

15

guilt therefrom, whether in the form of an instruction by the court or a remark by the prosecution.  [Citation.]" (*People v. Clair* (1992) 2 Cal.4th 629, 662.)

The court's comments do not invite the prospective jurors to infer guilt from appellants' decision to exercise their Fifth Amendment rights.  The court's comments consist of an acknowledgement that some people want to infer guilt when a defendant does not testify coupled with an admonition that it is very important not to infer guilt and thereby penalize a defendant for exercising his right not to testify.  In other words, the court was telling the prospective jurors to fight against a common impulse.  There is nothing improper about these remarks.

As for the use of the term "judges," appellants read too much into this term.  The trial court repeatedly told the prospective jurors to think of themselves as judges.  Well before making the above-quoted remarks, the court told the prospective jurors:  "I'm going to tell you that we are not partisans in this case.  You and I are judges here if you are selected."  Later, the court again told prospective jurors  "You are not to be investigators.  You are not to be partisans.  You are not to be litigants.  You are to be judges of the facts; no more, no less."  Thus, when the court stated that "sometimes what happens is people penalize—judges penalize defendants for not testifying," he was referring primarily to jurors.  There was nothing improper in this remark.

e.  Trial court's comments about punishment/death penalty

Appellant Baskin contends that the trial court's comment about punishment and the death penalty during voir dire violated the prohibition of considering penalty during the guilt phase of the trial.  Appellant Hill joins in this contention.

Respondent contends appellants have waived this claim by failing to object in the trial court.  (See *People v. Boyette, supra*, 29 Cal.4th at p. 459.)  We agree.  Assuming for the sake of argument that the claim was not waived, we would see no error.

The court first stated:  "In every criminal case, when a person is charged with a crime, . . . you have to have no concerns about it because in the same way that I as a

16

judge here cannot tell you what the facts are and what your verdict should be—that's the province of the jurors. If we go to the next step, you are not to tell me or consider penalty or punishment because that's irrelevant to you, period. That should never ever enter into your mind in your deliberations. I'll get back to that in a few moments."

The court later stated: "You're not to consider penalty or punishment. The important thing is not that you don't think about it because you can't help it sometimes. The important thing is that if those things come into your mind, you must do your utmost pursuant to your oath and to your morals and to your ethics— that you sort of take them out. You heard some of our leaders in the past. That they compartmentalize things. You have to compartmentalize it and put it outside your mind. After the case is over, you can do anything with it but not during the case. Ladies and gentlemen, keep that in mind, please."

Baskin is correct that the jury should not consider possible penalties when deciding guilt. (See *People v. Martinez* (2010) 47 Cal.4th 911, 958; *People v. Holt* (1984) 37 Cal.3d 436, 458.) The court's comments were an explanation of that prohibition, not a violation of it. It is of course the trial court's duty to explain such rules to the jury.

f. The court's "religious" references

Appellant Baskin contends the trial court's references to biblical terms and the jurors' religious beliefs were improper and, considered with the court's other comments, prejudicial. Appellant Hill joins this contention.

Respondent contends appellants have waived this claim by failing to object in the trial court. (See *People v. Boyette, supra*, 29 Cal.4th at p. 459.) We agree. Assuming for the sake of argument that the claim was not waived, we would see no error.

While questioning the individual prospective jurors seeking to be excused from jury service, the trial judge at one point commented about "flood gates." He said it was a biblical name. He said, "If I open the flood gates too wide [i.e., allowed prospective

17

jurors to open the doors of his courtroom in order to leave], even the attorneys would leave. I'm the only one left." Later during voir dire, the trial judge mentioned that he gave his courtroom doors the biblical name "flood gates." He reiterated, "I am convinced if I open those doors a little bit too wide, I'd be the only one left. I have to be careful of your request [to be excused from jury service]. Please keep that in mind."

Still on the topic of why he often needed to deny prospective jurors' requests to be excused from jury service, the trial judge noted, "Sometimes people say, you know, judge, my upbringing, my religious beliefs, my philosophical beliefs, my political beliefs, whatever beliefs that I have do not allow me to be sitting in judgment of another human being." The court explained why these excuses did not warrant being excused from jury service as follows: "[T]he problem is except in some very distant areas in the death penalty case, which this is not the one, that you are not . . . sitting in judgment of another human being. . . . [I]f you are selected [to be on the jury panel], you're going to be sitting in judgment of the evidence . . . ."

"Appeals to religious authority at the guilt phase are . . . impermissible . . . ." (*People v. Harrison* (2005) 35 Cal.4th 208, 247.) "The jury at the guilt phase is not charged with making an ethical or normative decision; instead, it decides questions of historical fact based on the evidence and applies to those facts the law as articulated by the trial court. Religious input has no legitimate role to play in this process. [Citation.] [¶] But not every reference to the Bible is an appeal to religious authority. Not only is the Bible a religious text, but it is also generally regarded as a literary masterpiece; indeed, it is among the oldest and best-known literary works in our culture. The English departments of major secular universities teach courses on the Bible as literature. And this court has repeatedly held that in closing argument attorneys may use 'illustrations drawn from common experience, history, or *literature*.' [Citations.] As an article in a respected law journal explains, 'fiction, anecdotes, jokes and *Bible stories* are commonly regarded as acceptable' in closing argument. [Citation.]" (*Id*. at pp. 247-248 [fn. omitted].)

The trial court's first "religious" reference was to flood gates and was clearly a literary allusion to illustrate the court's point. There is no doubt that a reasonable juror would have understood it as such. The court's comment was proper. The court's second "religious" reference simply acknowledged that some jurors have concerns that their religious beliefs prevent them from serving on a jury. This is not an appeal to religious authority in any way. The court in fact emphasized that jurors were to judge the evidence, not the person. The court's comment was proper.

g. The court's comment on race

Appellant Baskin contends the trial court improperly remarked on appellants' race. Appellant Hills joins in this contention.

Respondent contends appellants have waived this claim by failing to object in the trial court. (See *People v. Boyette, supra*, 29 Cal.4th at p. 459.) We agree. Assuming for the sake of argument that the claim was not waived, we would see no prejudice to appellants.

The trial court made one statement about race, telling the jurors prior to trial, "You are not to consider the defendants' race at all in this case to determine whether they are guilty or not guilty." Even assuming for the sake of argument that this remark were improper, we would find it harmless under any standard of review. (See, e.g., *Chapman v. California, supra,* 386 U.S. at p. 22; *People v. Watson, supra,* 46 Cal.2d at p. 836.) It was a very brief reference, substantively it was unobjectionable and, as we discuss throughout this opinion, the evidence against appellants was overwhelming.

2. Bifurcation

Appellant Baskin contends there was scant evidence at the preliminary hearing showing that the crimes were gang-related, and thus the gang evidence was extremely prejudicial with little probative value for the substantive charges. He concludes the trial

19

court erred in denying the defense motion to bifurcate the trial court of the gang enhancement allegations. Appellant Hill joins in this claim.

### a. Applicable law

A trial court's denial of bifurcation of a jury trial is subject to review for an abuse of discretion. The court's decision will not be disturbed on appeal unless it exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.)

"[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050.) "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Id*. at p. 1050.) "[A] trial court's discretion to deny bifurcation of a charged gang enhancement is similarly broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid*.)

### b. Proceedings below

Prior to trial, defense counsel jointly requested to bifurcate the gang allegations. The trial court denied the request.

The court explained its denial: "The issue is under a 352 analysis whether or not the prejudicial effect substantially outweighed the probative value and the consumption of time, a number of things."

"[U]sing this balancing process, based on the offer of proof that has been given to the court and the arguments that the three of you have made, the court comes to the reasonable, common sense conclusion, exercising its full discretionary powers, that the gang membership is prejudicial, but the probative value of that association, of that brotherhood, of sort of the Three Musketeers idea, the classical idea of the Three Musketeers substantially outweighs any prejudicial effect because even though motive is not an element, it does go to a certain motive. It goes to intent and identification when we have these three people that just how coincidental that they just meet at this store at the front door and decided to say, hey, let's make our day. This is a day's pay. We're going to go in there and break the cases and steal everything. At least two of them have hammers, and then the fact that Mr. Baskin, as an offer of proof, is injured."

"Again, I don't have any information whether or not we have any photos or any video of Mr. Baskin being at the location, but he goes back to the location where the first suspect, now the deceased, lives and is a known hangout. When we're looking at the totality of the circumstances, again, I think that it is relevant, and it is material, and the probative value clearly outweighs any prejudicial effect. [¶] And, therefore, the People are allowed to be able to use that testimony in the case in chief, and it is not bifurcated."

c. The trial court did not abuse its discretion by denying the motion to bifurcate

Section 186.22, subdivision (b)(1) applies to "any person who is convicted of a felony committed for the benefit of, at the direction of, or *in association with any criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (Italics added.) Generally, if the evidence shows that a defendant "intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote,

21

further, or assist criminal conduct by those gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 68.)

The evidence at the preliminary hearing showed that Hill, Baskin and Lincoln were members of the same gang, the Santana Blocc Compton Crip ("SBCC"). The evidence also suggested that the fourth robber was a gang member. Robberies were one of the primary activities of that gang. The victim's description of the attempted robbery showed concerted activity. Following the attempted robbery, Baskin went to a known SBCC gang house to seek assistance. This is sufficient evidence to support an inference that the attempted robbery was committed in association with a criminal street gang and with the requisite specific intent.

Since the evidence at the preliminary hearing supported an inference that the attempted robbery was gang-related, the trial court did not abuse its discretion in denying the motion to bifurcate the gang enhancement.

Even if the trial court erred, any error was harmless under any standard of review. (See, e.g., *Chapman v. California, supra,* 386 U.S. at p. 22; *People v. Watson, supra,* 46 Cal.2d at p. 836.) As we discuss in section 1 of this opinion, the evidence against appellants on the burglary and robbery charges was overwhelming. Jurors acquitted appellants on the most serious charge of murder, showing that they were not prejudiced by the gang evidence and were able to fairly consider each charge on its merits.

3. Sufficiency of the evidence – gang enhancement

Appellants contend there is insufficient evidence to support the jury's true findings on the gang enhancement allegations. They specifically contend the prosecution relied almost entirely on expert testimony and this testimony was deficient.

a. Applicable law

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

It is well settled that expert testimony may be used to prove a gang enhancement. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; *People v. Hernandez, supra*, 33 Cal.4th at pp. 1047-1048; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.) Indeed, "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang, supra*, 52 Cal.4th at p. 1048.)

Expert testimony concerning the culture, habits, and psychology of gangs is permissible because these subjects are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a); see also *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) Gang experts may testify regarding certain activities of the gang even though they may parallel the elements of the criminal street gang allegation. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) The expert also may testify concerning whether the defendant acted for the benefit of a gang, even though it is an ultimate factual issue for the jury to decide, because these are matters far

beyond the common experience of the jury.  (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120; *People v. Valdez, supra*, 58 Cal.App.4th at pp. 508-510.)  In addition, an expert's testimony is admissible concerning an individual's membership in a gang, the primary activities of a specific gang, the motivation for a particular crime, and gang-related tattoos.  (*People v. Hill, supra*, 191 Cal.App.4th at p. 1120.)

b.  Analysis

Here, the gang expert testified that robberies, including take-over and smash-and-grab robberies of jewelry stores, were one of the primary activities of SBCC.  He also testified that SBCC was a "tight knit" gang and was not a gang that "will just let anybody go and do [crimes like takeover robberies] without them."  This is sufficient to support the expert's testimony, in response to a hypothetical based on the facts of the case, that the attempted robbery was at the direction of the SBCC, and also in association with and for the benefit of the SBCC.

Appellant Hill contends that the expert's opinion that the robbery would have "benefited the gang because the jewelry could be turned into cash to buy narcotics [to then sell] stretches any realistic requirements of actual evidence of gang motivation."  Assuming Hill is correct that the proposed use of the cash strains credulity and is speculative, the essence of the opinion is sound:  SBCC committed jewelry store robberies to obtain jewelry which could be converted to cash to finance the ongoing activities of the gang.

Appellant Hill also contends that there is no evidence that "gang membership or the apparatus of the gang" were relied upon or played any role in the burglary and attempted robbery" and hence no evidence to support a finding that the crimes were committed "in association with" a criminal street gang.  Hill relies on *People v. Albillar, supra*, 51 Cal. 4th at page 60, for this evidentiary requirement.  In that case, the court found sufficient evidence that defendants relied on their common gang membership and the apparatus of the gang in committing the charged crimes.  (*Ibid.*)  Much of this

24

evidence came from the gang expert who testified in part that gang members chose to commit crimes together because, "'[t]hey can trust on each other's loyalties. They can handle contingencies that may arise during the commission of [the] crime that they did not plan for initially.'" (*Id*. at p. 60-61.) "In addition, the bonds within the gang 'would keep people from ratting on their own gang' to the police about the crimes that gang members were committing." (*Id*. at p. 61.) The remainder of the evidence came from the defendants concerted activities in committing the crimes.

Similar evidence was present here. There was ample evidence that appellants acted in concert with each other, Lincoln, and the unidentified fourth man. Lincoln assessed the jewelry store, left, then returned with appellants and the fourth man. They wore gloves and brought hammers to break through the glass cases in the store. The men broke at least some of the glass cases before fleeing from the victim's gunfire.

The gang expert testified that SBCC gang members "do it among themselves. [SBCC] is not a gang that will just let anybody go and do stuff like this without them." The expert explained: "There is a reason for that. The term 'snitch.' They don't want to take someone that is not going to be loyal to the gang. [¶] You really have to have a close knit group when you do stuff like this because they don't want the weak individual to wind up" in police hands. This is very similar to the expert's testimony in *People v. Albillar, supra,* 51 Cal. 4th at pages 60-61. There was also evidence that Baskin went to Lincoln's aunt's house, a known gang hangout, to seek assistance after he was (unexpectedly) wounded. Thus, he relied on the gang apparatus to handle a contingency that occurred during the crimes.

Appellants also rely on *In re Daniel C.* (2011) 195 Cal.App.4th 1350, *People v. Ramon* (2009) 175 Cal.App.4th 843, and *In re Frank S*. (2006) 141 Cal.App.4th 1192 to show insufficiency of the evidence. Their reliance is misplaced.

*In re Daniel C.* involved a minor who was an affiliate of a gang and who committed a robbery while accompanied by an admitted gang member and a gang affiliate. The gang enhancement was found true even thought the minor said no gang words and made no gang signs, and his companions were not involved in the crime. The

25

Court of Appeal reversed the true finding on the gang enhancement because there was "no evidence that the minor acted in concert with his companions. [The minor's] companions left the store before he picked up the [stolen item], and they did not assist him in assaulting [the victim]." (*In re Daniel C., supra*, 195 Cal.App.4th at p. 1361.) Here, as we discuss, *supra*, there was ample evidence that appellants acted in concert with each other, with Lincoln and with the unidentified fourth man.

*In re Frank S.,* involved a gang affiliate who committed the crime of carrying a concealed dirk or dagger. The gang enhancement was found true even though he was arrested alone. The minor told police that "he had been jumped two days prior and needed the knife for protection." There was no evidence that the minor had any reason to expect to use the knife in a gang-related crime. The Court of Appeal reversed the true finding, holding: "To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199.) Here, appellants committed the charged crimes in concert with fellow gang members, and there was evidence that robbery was a primary activity of their gang. This is sufficient to create an inference that appellants had the requisite specific intent. (See *People v. Albillar, supra*, 51 Cal.4th at pp. 60-61.)

*People v. Ramon* involved a gang member who was convicted of receiving a stolen vehicle, being a felon in possession of a firearm and carrying a loaded firearm in public; the gang enhancement allegations to those crimes were found true. Ramon was a gang member, was accompanied by another gang member, and was stopped in his gang's territory. The gang expert relied on identical hypothetical facts as the basis for his opinion that the crimes were committed for the benefit of the gang. The Court of Appeal reversed the true finding on the gang enhancement, ruling that these facts did not support the expert's opinion. The court concluded that "[t]he analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang." (*People v. Ramon, supra,* 175 Cal.App.4th at pp. 852-853.) Here, the expert's

26

opinion was that take-over and smash and grab robberies of jewelry stores were one of appellants' gang's primary activities.

Appellant Baskin also cites *People v. Ochoa* (2009) 179 Cal.App.4th 650 for the proposition that the gang expert's testimony alone was insufficient to support the gang enhancement. The Court of Appeal explained that the expert testimony alone was insufficient because "'[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*Id.* at p. 657) There was no such support in *Ochoa*, however, because the defendant made no gang references during the crimes and acted alone. (*Id*. at p. 653.) As we discussed, the crimes in this case involved at least three gang members acting in concert to commit a crime that was one of the primary activities of their gang. Thus, there was something more than just the gang expert's testimony.

### 4. Consciousness of guilt instruction

Appellants contend that the trial court violated their due process rights by instructing the jury with CALCRIM No. 372, which permits the jury to infer consciousness of guilt from flight. They contend the instruction is legally incorrect and was not supported by the evidence.[4]

The trial court instructed the jury on CALCRIM No. 372 as follows: "If a defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that a defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled or tried to flee cannot prove guilt by itself."

---

[4] Appellant Hill makes these contentions in his opening brief. Appellant Baskin joins in Hill's contentions and has also filed a supplemental letter brief on this issue.

a. Standard of review

A claim of instructional error is reviewed de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, [the reviewing court] must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.]' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.)

b. CALCRIM No. 372 is a correct statement of the law

Appellants contend CALCRIM No. 372 permits an irrational inference of guilt. Appellants are mistaken.

As appellants acknowledge, the California Supreme Court approved CALJIC No. 2.52, the predecessor instruction to CALCRIM No. 372. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 179-180.)[5] Appellants contends that CALCRIM No. 372 differs significantly from CALJIC No. 2.52 because the CALCRIM instruction uses the phrase "aware of his guilt" which is not found in the earlier CALJIC instruction. They contend that the CALCRIM phrase equates flight with guilt.

Appellants acknowledge that the Fifth District Court of Appeal rejected this claim in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, but argue this case is wrongly

---

[5] The Ninth Circuit has upheld instructions permitting consciousness of guilt to be inferred from false statements. (*United States v. Perkins* (9th Cir. 1991) 937 F.2d 1397, 1401-1402.)

28

decided. We agree with our colleagues in the Fifth Appellate District that the use of the term "aware of his guilt" does not create a different inference than the one permitted by the earlier CALJIC instruction. (*People v. Hernandez Rios, supra,* 151 Cal.App.4th at pp. 1158-1159.) CALCRIM No. 372 does not permit an irrational inference of guilt.

Appellants also contend CALCRIM No. 372 permits the jury to give evidence of flight whatever weight the jury chooses and even to make it the determinative factor in their deliberations. They conclude this violated their right to be convicted only upon proof of each element of the crime beyond a reasonable doubt. We do not agree.

The language of CALCRIM No. 372 states, "it is up to you to decide the meaning and importance of that conduct." This language is very similar to the language of its predecessor instruction, CALJIC No. 2.52, which told the jury, "[t]he weight to which this circumstance is entitled is a matter for you to decide." We see no meaningful difference between the two phrases.

The California Supreme Court has repeatedly rejected the claim that CALJIC No. 2.52 reduced the prosecutor's burden of proof. CALJIC No. 2.52 makes "clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. *The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.* [Citations.] We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [italics added]; see also, e.g., *People v. Boyette, supra,* 29 Cal.4th at pp. 438-439.) We likewise reject appellants' similar claim concerning CALCRIM No. 372.

Further, nothing in CALCRIM No. 372 negated multiple other instructions given in this case concerning the jury's fact-finding duties, including CALCRIM Nos. 200 (Duties of Judge and Jury), 220 (Reasonable Doubt), 226 (Witnesses), 251 (Union of Act and Intent: Specific Intent or Mental State), and 302 (Evaluating Conflicting Evidence).

c. CALCRIM No. 372 was properly given in this case

Appellants claim that the four suspects fled to escape the victim's shooting and so it was improper for the trial court to give a flight instruction. There is sufficient evidence of flight to support the instruction.

Both appellants not only left the store where the victim was shooting, but continued to flee. Baskin went to Lincoln's home. Hill fled to the park across the street from the store, where he apparently collapsed from his gunshot wounds. He was found by police in the middle of the park toward the alley. These circumstances are sufficient evidence to support the flight instruction for both appellants. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1054-1055 [it is well-established that flight does not require the physical act of running away from the crime scene; all it requires is that the defendant intended to avoid being seen or arrested].)

Further, the trial court instructed the jury that it only needed to use those instructions given by the court that applied to the facts that the jury found true. Specifically, the court instructed with CALCRIM No. 200 (Duties of Judge and Jury) in pertinent part, "Some of these instructions may not apply, depending on your findings about the facts of the case. [Do not assume just because I give a particular instruction that I am suggesting anything about the facts.] After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

d. Any error was harmless

Even assuming for argument's sake that the trial court committed instructional error in giving CALCRIM No. 372, such error was harmless under any standard of review. (See, e.g., *Chapman v. California, supra,* 386 U.S. at p. 22; *People v. Watson, supra,* 46 Cal.2d at p. 836.) As we discuss in section 1, *supra*, the evidence of appellants' guilt on the robbery and burglary charges was overwhelming. The jury

acquitted appellants of the most serious charge of murder, showing that the jury was not misled into believing that appellants were guilty simply because they left the scene.

## 5. Prosecutorial misconduct

Appellant Baskin contends the prosecutor committed misconduct when he stated, "We hear argument about the defendants not having guns. How do we know that? We know they had hammers, but we don't know that they didn't have guns." Appellant Hill joins in appellant Baskin's claims. We agree, but find the error harmless.

Respondent contends appellant Baskin waived this claim by failing to object. Baskin contends that any objection on his part would have been futile because appellant Hill's counsel objected and was overruled. We agree that an objection would have been futile, and so the claim is cognizable on appeal. (*People v. Arias* (1996) 13 Cal.4th 92, 159.)

The prosecutor is given wide latitude during closing arguments to make statements supported by the evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) The prosecutor is not permitted to go beyond the evidence and speculate or to substantially misstate the evidence. (*People v. Gonzales* (2011) 51 Cal.4th 894, 947.)

There was no evidence that appellants or their accomplices had guns. There was no evidence from which a reasonable juror could infer appellants or their accomplices had guns. The prosecutor's comments invited the jury to speculate that appellants or their accomplices had guns. This was improper.

The prosecutor's remarks were harmless, however, under any standard of review. (See, e.g., *Chapman v. California, supra,* 386 U.S. at p. 22; *People v. Watson, supra,* 46 Cal.2d at p. 836.) The jury acquitted appellants of the most serious charge of murder, indicating that the jury did not speculate that appellants were armed during the robbery and thereby provoked the victim's shooting. There was overwhelming evidence that appellants committed the burglary and attempted robbery.

6. *Romero* [6] motions

Each appellant contends the trial court erred in denying his motion to dismiss one or more prior strike convictions, and thereby violated his constitutional rights.

a. Applicable law

"[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, . . . the court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

A court's ruling on a motion to strike a prior conviction is reviewed under the deferential abuse of discretion standard. Under that standard an appellant who seeks reversal must demonstrate that the trial court's decision was irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions. "Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law," the reviewing court must affirm the trial court's ruling even if it "might have ruled differently in the first instance." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310; see *People v. Carmony* (2004) 33 Cal.4th 367, 373.)

---

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

b. Baskin's motion

In his motion to strike, appellant Baskin conceded that he went into the jewelry store with appellant Hill, Lincoln and a third male for the purpose of committing a "smash and grab" theft. Baskin described his role as carrying the bag. He pointed out that no jewelry was actually stolen. Appellant Baskin argued that mitigating factors in his favor were his current age, his age of 21 years when he committed his "strike" offense, his large, supportive family, his 10-year-old son, and his criminal history. He claimed that he "matured as a person and as a father," and that he "has grown spiritually." Appellant Baskin also claimed that his current offenses were for financial reasons only, and that he did not intend to hurt anyone, as indicated by his and his accomplices' lack of weapons other than the hammers.

Appellant's motion was accompanied by letters from his grandmother, mother, stepfather, two aunts, and a woman who used to babysit him, and also by a statement about an interview of jail chaplain Kevin Cannon. The chaplain said that he had met with appellant weekly for one hour since January 2011, and that appellant was "a 'sensitive, sincere person who wants to change.'" The chaplain also said that appellant had told him that he was innocent, and the chaplain believed appellant. The chaplain stated that incarcerating appellant would do a great disservice to appellant's son, the city and the community.

The court recognized that Baskin had the support of his family, but pointed out "that's sort of a two-edge sword . . . because when looking at 1385 in this area, . . . if we were to look at [appellants'] support, their backgrounds and things of that nature, one would say perhaps, just perhaps, these two young people shouldn't be here, not only should they not be here in this case but in any other case in the past because you have the support that many people do not have, have never had." The court continued, explaining, "because we are looking at the interests of justice in the totality, no matter how perhaps a court feels personally, when we're looking at the totality of the circumstances, as to Mr. Baskin, the court would be abusing its discretion in striking his prior. . . . I think that Mr.

Baskin was just released on parole . . . either from the state prison or from parole or active on parole."

We see no abuse of discretion in the trial court's denial of Baskin's motion. The court's discussion of family support shows that the court carefully considered the mitigating factors in this case, but concluded that they did not outweigh the aggravating factors, which included the current crime and Baskin's criminal history. The current crime was pre-planned and coordinated, and given that it involved four perpetrators, at least two of whom carried hammers, it carried the risk of violence. That violence in fact materialized. Baskin had a lengthy criminal record, beginning when he was 16 years old. He suffered his prior strike conviction in April, 2006, when he was 21 years old, and violated his parole in that matter in September, 2009. Since the trial court properly considered the nature and circumstances of appellant's current and prior convictions and the particulars of his background, character and prospects, and reached an impartial decision, that trial court did not abuse its discretion. (See *People v. Williams, supra,* 17 Cal.4th at pp. 161-164.)

Baskin's reliance on *People v. Cluff* (2001) 87 Cal.App.4th 991 to show an abuse of discretion is misplaced. The defendant in *Cluff* committed a technical violation of section 290 by failing to update his address on his birthday, but did so without an intent to deceive and without undermining the purpose of the law, since his existing registered address was accurate and police could easily locate him. (*Id*. at pp. 1001-1003.) There was no evidence he had committed any sex crimes since he left prison almost 10 years earlier, and a court-appointed psychologist opined that with probation supervision and participation in a treatment program, Cluff would not re-offend. (*Id*. at p. 1002.) In contrast, Baskin's criminal conduct was not merely a technical violation of the law, and Baskin re-offended quite soon after being released from custody. Baskin offered no expert testimony that he was unlikely to re-offend. Thus, *People v. Cluff, supra,* does not assist Baskin.

c.  Hill's motion

In his motion to strike, appellant Hill stated that he grew up in poverty, raised by an alcoholic and physically abusive mother who eventually moved with him to his grandmother's overcrowded house.  After his great-grandmother and great-uncle died within a month of each other in 2002, appellant was depressed, but did not receive treatment for his depression.  He did poorly in school, but received little help.  His limited intellectual functioning impaired his ability as an adult to make good decisions.

Appellant Hill claimed he became a gang "drop out" during his two years in jail awaiting trial in this matter.  He was "deeply saddened at the loss of life-long friend" Lincoln, whose death "impressed on Mr. Hill the need to turn his life around."  He was "highly remorseful" for his crimes.  Hill argued that another mitigating circumstance was his "near death experience" from being shot at by the victim and seriously injured, including forcing him for over a year to be wheelchair-bound as he learned to walk again.  His defense counsel wrote, "Often when someone has a near-death experience[,] they may be highly motivated to change any negative things in their life and work to become a more productive, positive member of society."

Appellant Hill's two strike priors for robbery arose from the same case; one was a residential robbery, the other a commercial robbery.  Appellant Hill claimed that he had committed two jewelry snatchings in the Metro area when he had been homeless, and that he had used the money from the jewelry to pay for motels.  He also claimed that he did not have a weapon.

The court recognized that "Mr. Hill, albeit he hasn't had the support perhaps that Mr. Baskin has had, but he still has all those relatives that have been there for him and are still there for him and that many other people have not had.  I believe that he was released from custody a few months before this incident.  And parole discharge date would have been 5-14-13.  [¶]  So when the court is looking at the totality of the circumstances as to Mr. Hill, . . . it would appear irrespective of his perceived lack of opportunities, that the interests of justice would even less be served to him than as to Mr. Baskin.  So, therefore,

35

when looking at the totality of the circumstances, again, the court would believe that I would be abusing my discretion if I struck any of the strikes for Mr. Hill."

We see no abuse of discretion in the trial court's denial of Hill's motion. The court's discussion of family support, including the fact that Hill did not have as much support as Baskin, shows that the court carefully considered the mitigating factors in this case, but concluded that they did not outweigh the aggravating factors, which included the current crime and Hill's criminal history. The current crime was pre-planned and coordinated. Hill admitted that he was one of the men carrying a hammer. Given that the crimes involved four perpetrators, at least two of whom carried hammers, it carried the risk of violence. That violence in fact materialized. As the court recognized, Hill had only recently been released from custody when he committed the crimes in this matter, and was still on parole from his prior convictions. Since the trial court properly considered the nature and circumstances of appellant's current and prior convictions and the particulars of his background, character and prospects, and reached an impartial decision, that trial court did not abuse its discretion. (See *People v. Williams, supra,* 17 Cal.4th at pp. 161-164.)

To the extent that appellant Hill also relies on *People v. Cluff, supra*, 87 Cal.App.4th 991, that reliance is misplaced for the same reasons that Baskin's reliance is misplaced.

## III. DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J.[*]

We concur:

TURNER, P. J.

MOSK, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37