Filed 1/14/15  P. v. Hebert CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058996 |
| v. | (Super.Ct.No. RIF1105818) |
| COLIN WILLIAM HEBERT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mac R. Fisher, Judge. Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

1

INTRODUCTION

Defendant Colin William Hebert appeals from judgment entered following jury convictions for two counts of attempted premeditated murder (Pen. Code, §§ 664 and 187, subd. (a);[1] counts 1 and 2); three counts of assault with a firearm (§ 245, subd. (a)(2); counts 3, 4, and 5); and one count of being a felon in possession of a firearm (§ 12021, subd. (a)(1); count 6)). Defendant admitted he suffered a prior conviction for purposes of being a felon in possession of a firearm (§ 667.5, subd. (b)). The jury found true enhancement allegations that defendant personally discharged a firearm as to counts 1 and 2 (§§ 12022.53, subd. (d), and 1192.7, subd. (c)(8)); personally used a firearm as to counts 3, 4, and 5 (§§ 12022.5, subd. (a), and 1192.7, subd. (c)(8)); and personally inflicted great bodily injury as to count 4 (§§ 12022.7, subd. (a), and 1192.7, subd. (c)(8)). The trial court sentenced defendant to a determinate term of 17 years in prison, plus a consecutive indeterminate sentence of 64 years to life.

Defendant contends there was insufficient evidence to support his conviction for attempted murder of Lizabeth Mandujano (count 1), and the prosecutor committed misconduct during closing argument by misstating the law regarding premeditation and deliberation. Defendant also argues the trial court violated his ex post facto rights by imposing restitution and parole revocation restitution fines under versions of statutes not in effect when defendant committed the charged crimes. In addition, defendant asserts

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

that the abstract of judgment and sentencing minute order should be corrected to reflect the oral pronouncement of his sentence.

We conclude there was sufficient evidence to support defendant's conviction for attempted murder of Mandujano, and the prosecutor's statements regarding premeditation and deliberation did not constitute prejudicial error. The trial court, however, erred in imposing restitution and parole revocation restitution fines, each in the amount of $280, when the statutory minimum in effect at the time defendant committed the charged crimes was $200. The trial court is also directed to correct the May 31, 2011 sentencing minute order and the abstract of judgment to show the correct sentencing imposed on counts 3 and 4, as reflected in the reporter's transcript. The judgment is affirmed in all other regards.

II

FACTS

Just after Lizabeth Mandujano and her boyfriend, Andres Cervantes, arrived at Mandujano's home on November 5, 2011, around 1:00 a.m., defendant and a companion drove up in a red Saturn. As Mandujano was opening her driveway gate, defendant and the driver of the red Saturn walked over to Cervantes and defendant said, "'What were you doing driving through my street that way?'" Cervantes responded, "'We weren't driving through your street crazy.'"

Defendant, his companion, and Cervantes started arguing. The Saturn driver spat in Cervantes's face. The men began fighting. Mandujano screamed and pleaded with defendant and his companion to leave Cervantes alone. She tried to pull defendant away

3

from Cervantes. When the men stopped fighting, Cervantes had a cut over his eye and a bloody nose. Defendant and his companion left.

About five minutes later, the red Saturn returned. Mandujano and Cervantes were inside Mandujano's house. Defendant got out of the car and, from right outside Mandujano's front gate, yelled for Cervantes to come outside. Mandujano went outside to her closed gate at the end of her driveway. Defendant told Mandujano to tell Cervantes to come outside. Mandujano was three feet from defendant and his companion. She did not call for Cervantes to come outside. Mandujano told defendant and his companion she would not let Cervantes come outside. Mandujano told them to go home. She added she did not want any problems. Defendant continued yelling for Cervantes. After about nine or ten minutes, defendant and his companion left.

Seven to ten minutes later, defendant returned to Mandujano's house with two other men. Mandujano went outside and saw the three men looking on the ground for something with a flashlight. Defendant was about three feet away from Mandujano, who was standing at the end of her driveway. Defendant told Mandujano he was looking for a wallet.

At some point, Cervantes went outside to tell Mandujano to go back inside, because he was worried about her. Defendant and his companions were in the street. Cervantes and Mandujano were five to six feet apart from each other when defendant ran down the middle of the street away from them and started shooting at them. When the shooting started, Cervantes grabbed Mandujano, pulled her up her driveway, and covered

4

her with his body.  Cervantes and Mandujano were about 20 feet away from defendant when he started shooting.  Mandujano heard three shots.

Mandujano's friends, Ruben Andrade and Jesus Rodriguez, heard shooting as they were walking to Mandujano's house to drink.  Rodriguez testified they were standing next to Mandujano's gate when they heard gunshots.  Rodriguez told Andrade to get down but Andrade had already been shot in his right shoulder at that point.  He leaned against a car and lost consciousness.  He did not regain consciousness until he was in the hospital.  Andrade and Rodriguez did not know who was shooting.  Mandujano ran over to Andrade and called 911.  Rodriguez told Sheriff's Investigator Christopher Poznanski the shooter was wearing a white sweatshirt.

Rita Hernandez, who lived on Mandujano's street, heard three to five gunshots. She ran to her front window and saw a thin male running down the street, pointing a gun over his left shoulder, and firing twice.  Hernandez heard the man yell, "Come on, mother fucker, I know you have one more shot" or "Come on, [mother fucker], I know you have one more."

About five days after the shooting, Poznanski went to Jonathan McMullen's house and recovered a sweatshirt, which McMullen told Poznanski belonged to defendant.  At the time of the shooting, defendant was living with McMullen.  McMullen lived two or three blocks away from Mandujano's home.  At trial, McMullen testified the sweatshirt belonged to another roommate.  Mandujano identified defendant as the shooter in a six-pack photo lineup and at trial.

5

The police found three bullet casings in the street, 70, 132, and 171 feet south of Mandujano's driveway. The police also found a man's wallet in the street, 27 feet south of Mandujano's house.

III

SUFFICIENCY OF EVIDENCE OF ATTEMPTED MURDER

Defendant contends there was insufficient evidence to support his count 2, attempted murder conviction. Specifically, defendant argues there was insufficient evidence he intended to kill Mandujano. Although defendant states in his opening brief and reply brief that he is challenging count 2, it is apparent he intends to challenge count 1, which alleges attempted murder of Mandujano. Count 2 concerns attempted murder of Cervantes. Defendant does not contest the sufficiency of evidence as to his conviction for attempted murder of Cervantes.

Defendant argues that the evidence showed defendant intended to shoot Cervantes, not Mandujano. Defendant further argues the prosecutor failed to argue in the trial court the "kill-zone" theory, and the jury was not instructed on the theory. The prosecutor argued during closing argument that defendant had a motive to kill. He was angry and wanted revenge. When he returned to Mandujano's house the third time and fired at Cervantes, defendant had already been in a fight with Cervantes earlier that evening. A finding of intent to kill was also supported by evidence that, when defendant returned, he was carrying a loaded gun. Furthermore, he pointed the gun toward Cervantes and Mandujano, pulled the trigger, and hit Andrade, who was nearby. Defendant's intent to

6

kill Mandujano also was supported by evidence defendant fired his gun at least three times in the direction of Cervantes and Mandujano.

Defense counsel responded during closing argument that there was insufficient evidence defendant was the shooter. Defense counsel also argued that evidence the shooter fired a gun three times was not enough to support a finding of intent to kill. During rebuttal, the prosecutor refuted defendant's argument there was insufficient evidence defendant was the shooter. The prosecutor further argued that evidence defendant pulled out his gun and fired three times at Cervantes and Mandujano showed that defendant wanted to kill both Cervantes and Mandujano. Even though the prosecutor did not refer to the "kill zone" during closing argument, there was substantial evidence supporting a reasonable finding of intent to kill Mandujano based on the theory.

As we stated in our recent decision, *People v. Canizales* (2014) 229 Cal.App.4th 820, 823-824 [Fourth Dist., Div. Two] (*Canizales*) regarding the kill zone theory, "In *People v. Bland* (2002) 28 Cal.4th 313, 328-330, 333, (*Bland*), the California Supreme Court explained, '[A defendant] who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder . . . if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. . . . [¶] . . . [¶] [However, t]he conclusion that transferred intent does not apply to attempted murder still permits a [defendant] who shoots at a group of people to be punished for the actions towards *everyone in the group* even if [the defendant] primarily targeted only one of them. . . . [A] defendant might be guilty of . . . attempted murder of *everyone in the group* . . . . [¶] . . . [T]he fact [the

7

defendant] desires to kill a particular target does not preclude finding that the [defendant] also, concurrently, intended to kill others within what it termed the "kill zone." "The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude [that the defendant] intended to ensure harm to the primary victim by harming *everyone in that victim's vicinity. . . ."'"

Elaborating on the kill zone theory, the court in *Bland* stated: "'[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B and C, and attacks the group with automatic weapon fire . . . devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact *may reasonably infer from the method employed an intent to kill others* concurrent with the intent to kill the primary victim. When a defendant escalate[s] his mode of attack from a single bullet aimed at A's head to a hail of bullets . . . the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can *reasonably infer that the defendant intended that harm to all* who are in the anticipated zone. . . .'" (*Bland, supra,* 28 Cal.4th at pp. 328-330, italics added.)

Here, the jury could reasonably find that, even if defendant primarily wanted to kill Cervantes, he also concurrently intended to kill Mandujano, whom Cervantes was standing next to and shielding with his body, after hearing defendant's first of three shots. (*Canizales, supra,* 229 Cal.App.4th at p. 823.) As in *Bland* and *Canizales*, there was

8

substantial evidence that, at the least, defendant intended to create a kill zone. (*Ibid.,*

*Bland, supra,* 28 Cal.4th at p. 333.) Such evidence included Cervantes's testimony that,

when the shooting started, Cervantes grabbed Mandujano, pulled her up her driveway,

and covered her with his body to protect her from being shot. Mandujano testified that,

when defendant started shooting, he was 15 to 20 feet from her, and Cervantes and

Mandujano were about five feet apart from each other. Cervantes immediately grabbed

Mandujano, while defendant fired two more shots toward Cervantes and Mandujano.

Based on this evidence that Mandujano was in the kill zone, the jury could make the

reasonable inference that defendant intended to kill Mandujano, who was in harm's way,

in the course of defendant attempting to kill Cervantes.

Citing *People v. McCloud* (2012) 211 Cal.App.4th 788, defendant argues the kill

zone theory does not apply in the instant case because the prosecutor did not argue the

theory. The prosecutor did not argue defendant intended to kill everyone in the kill zone

area. Rather, the prosecutor argued defendant intended specifically to kill Mandujano.

But as we explained in *Canizales, supra,* 229 Cal.App.4th at page 825, *McCloud* goes too

far. The California Supreme Court in *Bland, supra,* 28 Cal.4th 313, "posits that the intent

to kill the nontargeted person(s) *can be inferred* from the nature and scope of the attack

or from the method employed. If, as *McCloud* asserts, the defendant must in fact intend

to kill each attempted murder victim, there is no reason to employ the theory—the intent

to kill is established without resort to the theory. That *McCloud* overstates the theory is

proven by language in other California Supreme Court opinions." (*Canizales,* at p. 825.)

9

In *People v. Stone* (2009) 46 Cal.4th 131, 136, 137, our high court said of *Bland,* "The evidence supported a jury finding that the defendant intended to kill the driver [of the car into which he shot] but *did not specifically target* the two who survived. [Citation.] . . . We summarized the rule that applies when an intended target is killed and *unintended* targets are injured but not killed. . . . [¶] . . . [I]f a person targets one particular person, . . . a jury could find the person *also,* concurrently, intended to kill— and thus was guilty of the attempted murder of—other, *nontargeted*, persons." (Some italics in original, some added.)

As explained in *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023, the kill zone theory "permits a rational jury *to infer the required express malice* from the facts that (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. [It] recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person. . . . [It] imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person . . . despite the recognition, or with the acceptance of the fact, that *a natural and probable consequence of that act would be that anyone within that zone could or would die.*" The kill zone theory "is simply a reasonable inference the jury may draw in a given case. . . ." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1243; *Canizales, supra,* 229 Cal.App.4th at p. 826.) Based on such a reasonable inference, we conclude there was substantial evidence in the instant case to support a reasonable finding of intent to kill Mandujano.

10

Even if the kill zone theory does not apply here, there was sufficient evidence to support a finding defendant intended to kill Mandujano. "The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218; in accord, *People v. Smith* (2005) 37 Cal.4th 733, 741.) It is not dispositive that defendant did not kill Mandujano or Cervantes. The fact that the victim may have escaped death because of the shooter's poor marksmanship does not necessarily establish a less culpable state of mind. (*Smith,* at p. 741.)

"In addition, motive is not an element of the crime of attempted murder. [Citation.] That defendant did not know his victims or bear them any ill will does not demonstrate that he lacked the intent to kill. Although motive is often probative of an intent to kill, the absence of a clear motive does not demonstrate the lack of an intent to kill." (*People v. Houston, supra,* 54 Cal.4th at p. 1218; in accord, *People v. Smith, supra,* 37 Cal.4th at pp. 740-741.) Even though the evidence may not have established motive for defendant to kill Mandujano, this does not demonstrate a lack of intent to kill.

Here, the totality of the evidence established that defendant repeatedly and intentionally discharged his gun at Mandujano and Cervantes, at close range, from a distance of 15 to 20 feet, in a manner that could have inflicted a mortal wound. A reasonable trier of fact could have concluded that Mandujano was simply in the way of defendant's attempt to shoot Cervantes or was a target of "defendant's misdirected anger or part of his scheme to draw attention to his plight." (*People v. Houston, supra,* 54 Cal.4th at p. 1218.) Furthermore, "'if the jury found defendant's use of a lethal weapon

11

with lethal force was purposeful, an intent to kill could be inferred, *even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance.*'"  (*People v. Smith, supra,* 37 Cal.4th at p. 741; in accord, *People v. Arias* (1996) 13 Cal.4th 92, 162.)

The fact that defendant may have fired and then abandoned his efforts before killing anyone "does not compel the conclusion he lacked the intent to kill in the first instance.  [Citation.]  Defendant may not have finished off these victims for any number of reasons."  (*People v. Houston, supra,* 54 Cal.4th at p. 1218; in accord, *People v. Smith, supra,*37 Cal.4th at p. 741.)  Here, there was evidence defendant would have continued shooting at Mandujano and Cervantes but ran out of bullets.  Hernandez heard defendant yell, "Come on, mother fucker, I know you have one more shot" or "Come on, [mother fucker], I know you have one more."

We conclude that under the circumstances of the shooting incident and totality of the evidence, there was sufficient evidence to sustain defendant's conviction for attempted murder of Mandujano.  (*People v. Houston, supra,* 54 Cal.4th at p. 1218; in accord, *People v. Smith, supra,*37 Cal.4th at p. 741.)

IV

INSTRUCTIONS ON PREMEDITATED AND DELIBERATE MURDER

Defendant contends the prosecutor committed misconduct by misstating the law on premeditation and deliberation.  Defendant argues the prosecutor improperly equated the thought process of deciding whether to proceed through an intersection on a yellow light with premeditation and deliberation to kill someone.

12

"The principles of law applicable to a defendant's claims of prosecutorial misconduct are well settled. ""'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Adams* (Oct. 30, 2014, S118045) ___ Cal.4th ___ [2014 Cal. LEXIS 10319, *56].)

Defendant challenges the prosecutor's statements during closing argument that premeditation and deliberation is "more like a yellow light. It happens to people all the time, right? You're driving towards an intersection, there's a light and it turns yellow. [¶] What goes through your head? [¶] How fast are you going? [¶] Is there anyone behind you? [¶] Are there any other cars to your left or right? [¶] How far is the light from you? [¶] Do you see any police officers? [¶] Is there anyone in the intersection? [¶] Any pedestrians around? [¶] Is it day? [¶] Is it night? [¶] Are you running late? [¶] Can you afford an extra five minutes? [¶] Do you know this intersection? [¶] Is it one of those that has a really long red light or a really short red light? [¶] What lane are you in? [¶] Can you take a right on the red light instead and save a couple minutes? [¶] All of those things go through your head in, what, a second or two? And you make a

13

decision. You consider all the factors and you make a decision. 'I'm either going to stop or I'm going to go.' Right? [¶] That is deliberation and premeditation, and that's an everyday decision, right? But ultimately, it can be life or death [¶] Car accidents kill people. They do. Especially things like this where you blow a yellow light, and you t-bone someone, or you put the brakes on too hard and you get rear ended. [¶] These are life and death decisions. These are the kinds of decisions that can end up with someone getting hurt. Does that mean you didn't deliberate? No. [¶] Look at the jury instruction on this issue. Time has nothing to do with it. It's focus."

Defense counsel moved for a mistrial on the ground the prosecutor incorrectly explained premeditation by analogizing it to deciding whether to proceed through the intersection on a yellow light. The trial court denied the objection. The court stated, "I think that's actually argument of counsel, clearly argument of counsel by way of analogy. And I invite the Defense to point out to the jury how baseless that analogy is, as apparently it is the belief of the Defense that it's an improper analogy, that you can make that argument to the jury. That's a jury issue."

Citing *People v. Glen Johnson* (2004) 119 Cal.App.4th 976 (*Glen Johnson*), *People v. Danny Johnson* (2004) 115 Cal.App.4th 1169 (*Danny Johnson*), and *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), defendant argues this comparison of the thought process used when going through an intersection with that of killing someone, trivialized the premeditation and deliberation element of murder by equating it to the decisionmaking process used in daily life to decide routine matters. A finding of deliberation for a murder conviction based on premeditated and deliberate acts requires

14

proof of "careful thought and weighing of considerations for and against the proposed course of action." (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) Defendant argues the prosecution's comparison of the decisionmaking process used when proceeding through an intersection to that of killing someone, was a mischaracterization designed to diminish the prosecution's burden on the issue of premeditation and deliberation.

*Glen Johnson*, *Danny Johnson*, and *Nguyen* are not on point since they concern the propriety of the prosecutor's statements and jury instruction on the meaning of the phrase, "beyond a reasonable doubt." The court in *Glen Johnson* concluded the trial court and prosecutor's statements regarding reasonable doubt, made during jury selection and closing argument, improperly lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt by equating proof beyond a reasonable doubt to everyday decisionmaking in a juror's life. (*Glen Johnson, supra,* 119 Cal.App.4th at p. 985.) The court in *Danny Johnson* similarly rejected the notions "that people planning vacations or scheduling flights engage in a deliberative process to the depth required of jurors or that such people finalize their plans only after persuading themselves that they have an abiding conviction of the wisdom of the endeavor. Nor can we say that people make such decisions while aware of the concept of 'beyond a reasonable doubt.'" (*Danny Johnson, supra,* 115 Cal.App.4th at p. 1172.) In *Nguyen*, the court stated it "strongly disapprove[d] of arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry." (*Nguyen, supra,* 40 Cal.App.4th at p. 36.)

15

The instant case is distinguishable from *Glen Johnson*, *Danny Johnson* and *Nguyen* in that defendant's objection here does not concern the prosecutor or the trial court improperly amplifying the concept of reasonable doubt. There was no misstatement of the reasonable doubt standard. Defendant's objection here concerns the murder element of "premeditation and deliberation." Furthermore, the trial court properly instructed the jury on premeditation and deliberation.

Although the court in *Nguyen* concluded the prosecutor made improper statements regarding reasonable doubt, the court did not reverse the defendant's burglary conviction because "Nguyen was not prejudiced since the prosecutor did direct the jury to read the reasonable doubt instruction and the jury was correctly instructed on the standard. We must presume the jury followed the instruction and that the error was thereby rendered harmless." (*Nguyen, supra,* 40 Cal.App.4th at pp. 36-37.) Likewise, here, even assuming the prosecutor's argument on premeditation and deliberation was improper, defendant was not prejudiced because the trial court properly instructed the jury on premeditation and deliberation, and we must presume the jury followed the instruction. (*Ibid.*) The court also instructed the jury that nothing the attorneys said was evidence, including their remarks during closing arguments. There thus was not a reasonable likelihood that the jury construed or applied any of the complained-of statements on deliberation and premeditation in an objectionable fashion. (*People v. Adams, supra,* ___ Cal.4th at p. ___ [2014 Cal. LEXIS 10319, *56].)

In addition, there was substantial evidence supporting the jury's finding of premeditation and deliberation. Defendant appeared at Mandujano's house three times

16

within a short period of time. The first time, defendant and Cervantes got into a verbal and physical fight. The second time, defendant yelled for Cervantes to come outside, and finally left after yelling for about 10 minutes. The third time, defendant returned with two companions and began shooting at Cervantes when he came outside, not just once but three times, while he was standing near Mandujano. This evidence was more than sufficient to support the jury's finding that defendant fired his gun and committed attempted murder of Cervantes and Mandujano with premeditation and deliberation. Even if the prosecutor's statements regarding premeditation and deliberation were improper, they were harmless beyond a reasonable doubt. (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887; *Neder v. U.S.* (1999) 527 U.S. 1, 2; *People v. Adams, supra,* ___ Cal.4th at p. ___ [2014 Cal. LEXIS 10319, *56].)

V

EX POST FACTO RIGHTS

Defendant contends the trial court violated his ex post facto rights under the federal and state Constitutions by imposing a restitution fine and parole revocation restitution fine, each in the amount of $280. When defendant committed the charged crimes, the statutory fine amounts were each a minimum of only $200 under sections 1202.4, subdivision (b)(1), and 1202.45. During the sentencing hearing, the trial court stated that it would impose the minimum amount allowable. The prosecutor and defense counsel believed the minimum amount was $280, which the trial court accordingly imposed.

17

The People agree the restitution and parole revocation restitution fines should each be reduced to $200. "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions." (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Imposition of a parole revocation restitution fine pursuant to section 1202.45 is also viewed as punitive for ex post facto purposes. (*People v. Isaac* (2014) 224 Cal.App.4th 143, 147.)

We look to the applicable statutes in effect at the time of defendant's offense to determine whether the $280 fines violated the ex post facto clause. (*People v. Souza, supra,* 54 Cal.4th at p. 143.) The minimum amount of each fine at the time of defendant's November 5, 2011, crimes was $200. (§ 1202.4, Stats. 2011, ch. 45 (S.B. 208), § 1 [eff. July 1, 2011, to Dec. 31, 2011]; § 1202.45, Stats. 2007, c. 302 (S.B. 425), § 15 [eff. Jan. 1, 2008, to Dec. 31, 2012].) Since the record shows that the trial court intended to impose the minimum restitution and parole revocation restitution fines permissible under sections 1202.4, subdivision (b)(1), and 1202.45, the court should have imposed $200 for each of the two fines. Therefore, as the parties agree, defendant's restitution and parole revocation restitution fines must be reduced to $200 for each fine.

VI

ABSTRACT OF JUDGMENT AND MINUTE ORDER

Defendant requests this court to direct the trial court to amend the abstract of judgment and May 31, 2013 minute order to reflect accurately the sentence imposed at

18

the hearing on May 31, 2013.  The People agree the minute order and abstract of judgment are incorrect as to sentencing on counts 3 and 4.

The reporter's transcript states that during the sentencing hearing, the trial court ordered count 4 to be the principal term and imposed the middle term of three years for the crime, three years for the section 12022.7, subdivision (a) enhancement, and 10 years for the section 12022.5, subdivision (a) enhancement.  Counts 3, 5, and 6 were stayed under section 654.  The May 31, 2013 minute order and abstract of judgment incorrectly state that the section 12022.5, subdivision (a), firearms use enhancement was stayed under section 654 as to count 4, and imposed as to count 3, which is a stayed count.

Where there is a discrepancy between the reporter's transcript and the minute order or abstract of judgment, the oral pronouncement controls.  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  Here, because the oral pronouncement controls, the May 31, 2013 minute order and abstract of judgment must be amended to state that the section 12022.5, subdivision (a), firearms use enhancement is imposed as to count 4, and stayed under section 654 as to count 3, as stated in the reporter's transcript.

VII

DISPOSITION

The restitution and parole revocation restitution fines are each ordered reduced from $280 to $200, under the version of sections 1202.4, subdivision (b)(1), and 1202.45 in effect at the time defendant committed the charged crimes.  In addition, the trial court is directed to amend the May 31, 2011 minute order and abstract of judgment to state that

19

the section 12022.5, subdivision (a), firearms use enhancement is imposed as to count 4, not count 3, which is stayed under section 654.  The superior court is further ordered to modify the abstract of judgment to reflect the reduction in the restitution and parole revocation restitution fines to $200 each, and to forward a certified copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


McKINSTER

Acting P. J.


MILLER

J.


20