[No. F042905. Fifth Dist. June 23, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
GLEN MAURICE JOHNSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 1.

## COUNSEL

Joan Isserlis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, Stan Cross and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## GOMES, J.—

### BACKGROUND

A jury found Glen Maurice Johnson guilty of second degree murder, conspiracy to murder, and accessory to murder, found all 13 allegations of overt acts true, and found all three allegations of arming of a principal with a firearm true. (Pen. Code, §§ 32, 182, subd. (a)(1), 187, subd. (a), 12022, subd. (a)(1).) On appeal, he argues, inter alia, that insufficiency of the evidence and instructional error on reasonable doubt require reversal. We will reject the insufficiency of the evidence argument, but instructional error on reasonable doubt will require that we reverse the judgment and order a new trial.

### DISCUSSION

1. Sufficiency of the Evidence[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Instructions on Reasonable Doubt*

"The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' [Citation.]" (*In re Winship* (1970) 397 U.S. 358, 363 [25 L.Ed.2d 368, 90 S.Ct. 1068].) Due process "protects the accused against

---

[*]See footnote, *ante*, page 976.

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged." (*Id.* at p. 364.)

The record shows that during jury selection the court amplified at length on the standard reasonable doubt instruction (CALJIC No. 2.90):

"Q. [Prospective juror], tell us what you've done in your life, decisions you've made, where there has been absolutely no doubt in your mind.

"A. Starting a family.

"Q. Starting—

"A. No doubt in my mind that I wanted children.

"Q. No doubt in your mind that you wanted children. Did you have some doubt whether you could support them and nurture them properly?

"A. Yes.

"Q. So there was doubt, wasn't there[?] [¶] Is this the right time?

"A. Yeah.

"Q. That went through your mind. [¶] So we have eliminated that one. [¶] Can you come up with another one—absolutely no doubt in your mind?

"A. I wanted to go to college.

"Q. Okay. Did you go to college?

"A. Yes.

"Q. But when you went to college, when you left home, is there a little bit of question in your mind—did you leave home to go to college?

"A. Yes.

"Q. Was there a little bit of question in your mind?

"A. Yes.

"Q. Okay. We have eliminated that one. [¶] Can you come up with absolutely no doubt[?] [¶] Still looking for that. We will be here for a long long time and never come up with anything—you won't. [¶] What are you going to do when you're here on a jury and you want to be convinced beyond all possible doubt when it's never happened in your life?

"A. Good question.

"Q. There is a solution to it. What's the solution?

"A. Beyond a reasonable doubt.

"Q. Very good. See how smart this jury is getting. You're really now getting into it. That's what I like. [¶] If you work at it, all of you can figure it out."

The court authorized the prospective jurors to find Johnson guilty even if they were to have "some doubt" about his guilt and characterized a juror who renders a guilty verdict with "no doubt" about his guilt as "brain dead": "So you've got to be convinced beyond a reasonable doubt, not beyond all possible doubt. [¶] . . . [I]f any of you think you can sit in a jury trial in a criminal case and render a guilty verdict and walk out of this courtroom feeling good about the verdict because there is absolutely no doubt in your mind, it will not happen. Even if you render a guilty verdict, there will be some doubt in your mind[s]. [¶] If there is no doubt in your mind, then I can tell you you were brain dead during the trial—you are brain dead. That's not going to happen."

The court gave the prospective jurors the "legal definition" of reasonable doubt: "When we say you have to be convinced beyond a reasonable doubt, we mean an abiding conviction of the truth of the charge. That's what you have to have, an abiding conviction of the truth of the charge."

The court equated proof beyond a reasonable doubt to everyday decision-making in a juror's life:

"Q. . . . Let me just try something, because, you know what, just like the decisions that [prospective juror] made . . . in her life that she thought she was sure of until we questioned her, every decision you make in your life is based on . . . what's reasonable and possible. [¶] Can you think of anything you did today where you made decisions based on reasonable or possible?

"A. Yes, went to lunch close by so I wouldn't be late.

"Q. Possible [*sic*] went to a restaurant close by—that you went to a place that had food poisoning problems?

"A. Hopefully not, but possible.

"Q. If you had gone to one of the restaurants you're familiar with, you wouldn't have to worry about that. Was it reasonable for you to go that distance and try to be here on time[?] [¶] The answer is no.

"A. No.

"Q. So that's reasonable to go to a local restaurant."

With another prospective juror, the court continued to equate proof beyond a reasonable doubt to everyday decisionmaking in a juror's life:

"Q. How many of you drive an automobile[?] [¶] Everybody. [¶] How many of you are good drivers[?] [¶] Well, quite a few. [¶] All right. Let's try [prospective juror].

"A. My name's—

"Q. [Prospective juror], let me ask you a question first. You're a good driver?

"A. Yeah.

"Q. How many years have you been driving?

"A. Five.

"Q. You're still in the thinking stage after five years of driving. Been driving as long as I do, you don't have a mind anymore when you're behind a wheel. [¶] When you come to an intersection, the intersection controlled with lights and the light is green, what do you do[?] [¶] What do you as a good driver do?

"A. Drive through, look for pedestrians.

"Q. What else do you do[?] [¶] [Prospective juror], are you a good driver?

"A. I guess when I want to be.

"Q. When you want to be. [¶] What do you do when you come to an intersection and the light is green?

"A. Look both ways.

"Q. Good. Look both ways. [¶] Have your foot on the gas, get ready to take it off if you have to. Anything could happen in the intersection. [¶] Am I right so far[?] [¶] Okay. As you get close to that intersection with the green light, actually take it off the gas, put it on the brake, stop, get out, walk around the front, look at the cross-traffic lights to make sure they're red. [¶] Do you do that?

"A. No.

"Q. Is it possible those lights could malfunction, electrical mechanical malfunction?

"A. Possible.

"Q. Sure. If they malfunction, couldn't there be a serious accident there? [¶] Why don't you get out and check that?

"A. 'Cause I guess I ain't a good driver.

"Q. You don't, because it is not—

"A. Reasonable.

"Q. Very good, [prospective juror]—not reasonable. [¶] Everything you do, you can look at what's reasonable and possible, and I tell you every decision you make along in your life are [sic] based on—that human beings—power of reason—something animals don't have. [¶] So we have that power of reason, and with that we can make these decisions along the way. [¶] So that's—that's not a definition of reasonable doubt, but that's what we want you to bring to court with you, the same thing you use every day in making your decision[s]. [¶] . . . [¶] We found out now what you have to do. Go back to the jury room and figure out what happened beyond a reasonable doubt, not beyond all possible doubt. [¶] But the first thing you have to decide as jurors is: Is what happened beyond a reasonable doubt, because you are never going to know what really happened beyond all possible doubt, nor am I. We weren't there."

After one prospective juror acknowledged difficulty in passing moral judgments on others, the court gave the instruction that jurors are not to "pass a moral judgment" but are simply to make the "kind of decisions you make every day in your life":

"There is no place for you to pass a moral judgment in this court. The thing that you're doing is kind of decisions you make every day in your life, figuring out what happened, whether the defendant is guilty or not guilty.

"That's the kind of thing, the secular things, that you decide every day in your life."

After another prospective juror expressed an inability as a matter of conscience and religion to participate in a jury trial, the court instructed that jurors who find an accused person guilty or not guilty engage in the same decisionmaking process they "use every day. When you get out of bed, you make those same decisions."

In argument to the jury, the prosecutor took his cue from the court's reasonable doubt instructions, characterized a juror who could return a guilty verdict without "some doubt" about Johnson's guilt as "brain dead," and equated proof beyond a reasonable doubt to everyday decisionmaking in a juror's life:

"As Judge Oberholzer explained to you even with yourself, the things that you've done in your own life, there has always been, at the minimum, some kind of bit of doubt in the back of your mind about whether or not what you're doing is right or wrong. Even though you felt really strongly about it, there is still kind of lingering doubt. That's always going to be there.

"The Judge said something to you which I thought was a pretty good explanation. He said if you walk out of here after rendering a guilty verdict without some sort of doubt in your mind, then you were brain dead during the trial.

"He's right. You are not—if you come out of here, you are not—after rendering a guilty verdict, I can guarantee you will have some doubt, but that's not the issue.

"The issue, is that a reasonable doubt, is it a doubt based upon reason, not is it just a possible doubt.

"Is it possible? Is it possible that [] Lenix would not discuss the murder that he was about to commit with [] Johnson?"

Johnson's counsel objected to the prosecutor's use of the term "possible" as "misstating the reasonable doubt concept." The court noted that "the jury instructions, which are controlling," define reasonable doubt as "abiding conviction of the truth of the charge" and overruled the objection. The

prosecutor argued that although Lamar's murder was "possible" even without Lenix arranging his escape beforehand with fellow gang member Johnson "clearly it's not reasonable":

"And that's the question, ladies and gentlemen. That's the threshold you have. [¶] Anything is possible. Anything is possible, but it's not reasonably possible."

After both parties rested and argued their cases to the jury, the court instructed with CALJIC No. 2.90:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

"Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

■ The Attorney General argues Johnson forfeited his right to appellate review by failing to object to the court's reasonable doubt instructions. First, the general rule is settled that even in the absence of an objection the accused has a right to appellate review of any instruction that affects his or her substantial rights. (Pen. Code, § 1259; *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) ■ Second, since the argument to which the court overruled Johnson's objection paraphrased the court's own instructions during voir dire, the inference arises that an objection to the instructions would have been futile, so the general rule barring appellate review does not apply. (See *People v. Hill* (1998) 17 Cal.4th 800, 822 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Third, "[t]he fact that a party, by failing to raise an issue below, may forfeit the right to raise the issue on appeal does not mean that an *appellate court* is precluded from considering the issue. 'An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party. . . . Whether or not it should do so is entrusted to its discretion.' " (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 36, p. 497, quoting *People v. Williams* (1998) 17 Cal.4th 148, 162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429]; see *People v. Marchand* (2002) 98

Cal.App.4th 1056, 1061 [120 Cal.Rptr.2d 687] [appellate court has discretion to adjudicate important question of constitutional law despite party's forfeiture of right to appellate review].) Here, nothing less fundamental is at stake than the denial of Johnson's due process protection "against conviction except upon proof beyond a reasonable doubt." (*In re Winship, supra,* 397 U.S. at pp. 362–364.) We reject the Attorney General's forfeiture argument.

Well over a century ago, the issue before the California Supreme Court was an instruction authorizing a guilty verdict if the evidence satisfied the jury of the accused's guilt to a " 'certainty as would influence the minds of the jury in the important affairs of life.' " (*People v. Brannon* (1873) 47 Cal. 96, 97.) On the ground that equating proof beyond a reasonable doubt to everyday decisionmaking in a juror's life lowers the burden of proof to a preponderance of the evidence, the court reversed the judgment and ordered a new trial: "The judgment of a reasonable [person] in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence. Juries are permitted and instructed to apply the same rule to the determination of civil actions involving rights of property only. But in the decision of a criminal case involving life or liberty, something further is required." (*Ibid.*)

Just months ago, a Court of Appeal case confirmed *Brannon*'s enduring vitality. During jury selection, the court "amplified on the concept of reasonable doubt" by noting that although " 'we all have a possible doubt whether we will be here tomorrow' " we " 'take vacations' " and " 'get on airplanes' " because we " 'have a belief beyond a reasonable doubt that we will be here tomorrow.' " (*People v. Johnson* (2004) 115 Cal.App.4th 1169, 1171 [9 Cal.Rptr.3d 781].) The court rejected the notions "that people planning vacations or scheduling flights engage in a deliberative process to the depth required of jurors," or "finalize their plans only after persuading themselves that they have an abiding conviction of the wisdom of the endeavor," and "make such decisions while aware of the concept of 'beyond a reasonable doubt.' " (*Id.* at p. 1172.) In reliance on *Brannon*, the court reversed the judgment and ordered a new trial on the ground that "the trial court's attempt to explain reasonable doubt had the effect of lowering the prosecution's burden of proof." (*Ibid.*)

■ Here, as in *Brannon*, the court's tinkering with the statutory definition of reasonable doubt, no matter how well intentioned, lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt. (*In re Winship, supra,* 397 U.S. at pp. 363–364; see *Cage v. Louisiana* (1990) 498 U.S. 39, 40–41 [112 L.Ed.2d 339, 111 S.Ct. 328], disapproved on another ground in *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475]; *Brannon, supra,* 47 Cal. at

p. 97; cf. Pen. Code, § 1096.) Lamentably, "the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281 [124 L.Ed.2d 182, 113 S.Ct. 2078].) The error "unquestionably qualifies as 'structural error' " and compels reversal per se. (*Id.* at p. 282; *People v. Harris* (1994) 9 Cal.4th 407, 427 [37 Cal.Rptr.2d 200, 886 P.2d 1193]; *People v. Evans* (1998) 62 Cal.App.4th 186, 195–196 [72 Cal.Rptr.2d 543].)

Over a quarter of a century ago, a thoughtful Court of Appeal opinion collected cases from a number of jurisdictions on the fate of "innovative" and "[w]ell .intentioned efforts" by trial courts "to 'clarify' and 'explain' " reasonable doubt that instead created "confusion and uncertainty" and led to reversals on appeal. (*People v. Garcia* (1975) 54 Cal.App.3d 61, 63 [126 Cal.Rptr. 275].) A few excerpts from those cases are instructive: "[Citation]: '. . . [T]he term "reasonable doubt" best defines itself. All attempts at definition are likely to prove confusing and dangerous.' [Citation]: 'Every attempt to explain [the definition of reasonable doubt] renders an explanation of the explanation necessary.' [Citation]: 'It is in a term which needs no definition, and it is erroneous to give instructions resulting in an elaboration of it.' [Citation]: '[G]enerally, the attempted definitions of [reasonable doubt] . . . are simply misleading and confusing, and not proper explanations of their meaning at all.' [Citation]: 'As it is difficult, if not impossible, to give a precise and intelligible definition of what a reasonable doubt is, without extending an instruction into almost a treatise upon the subject, . . . the better practice is to follow as nearly as practicable the language of the [statute], which is certainly as intelligible and as easily comprehended as the definition given in this case.' " (*Id.* at p. 66.)

To any trial judge who feels the urge to clarify or explain reasonable doubt, we commend the concise history of the reasonable doubt standard that appears in the latest CALJIC compendium. (California Jury Instructions, Criminal, Appendix B (Jan. 2004 ed.).) Originating in English cases of centuries ago, that history came to fruition only in the past decade with "the universal approval" by federal and state courts alike of CALJIC No. 2.90, "conclusively settl[ing]" its "legal sufficiency and propriety." (*Id.* at p. 1240.) We trust that any trial judge who reads that history will heed the two English bards whose sage advice antedated *Garcia* by only a few years: "Let it be." (Lennon & McCartney (Northern Songs 1970) "Let It Be.")

## DISPOSITION

We reverse the judgment and order a new trial. (Pen. Code, § 1262.)[2]

Harris, Acting P. J., and Dawson, J., concurred.

A petition for a rehearing was denied July 21, 2004, and the petitions of both respondent and appellant for review by the Supreme Court were denied September 29, 2004. George, C. J., did not participate therein.

---

[2] In light of our holding, we will adjudicate none of Johnson's other issues.