Filed 8/9/21  P. v. Perez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ABEL PEREZ,<br><br>    Defendant and Appellant. | F078217<br><br>(Super. Ct. No. DF012969A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Abel Perez was convicted by jury of assault by a state prison inmate with force likely to cause great bodily injury.  The jury issued a true finding he utilized a deadly weapon during the assault.  He raises numerous claims on appeal to challenge his

conviction. His principal contention is the trial court erred by suggesting to the jury the beyond-a-reasonable-doubt standard was equivalent to normal decisions made in daily life.

We are compelled to agree. This is not a case involving an isolated comment at some relatively remote point in the trial. Nor is it a case in which the challenged comments were clearly dwarfed by proper instruction.

Rather, the trial court here compared a jury's criminal factfinding role with daily decisionmaking both while reading evidentiary instructions prior to hearing evidence, and then again while reading evidentiary instructions at the close of trial. For these reasons we find the comments prejudicial and will reverse the judgment.[1]

## BACKGROUND

**Charges**

The Kern County District Attorney charged Perez with committing assault by a state prison inmate with force likely to cause great bodily injury. (Pen. Code,[2] § 4501, subd. (b).) It was also alleged Perez suffered numerous prior convictions. (§§ 667, subds. (b)-(i) & 1170.12, subds. (c)-(g) , 667, subd. (a), 667.5, subd. (b).)

**Trial Evidence**

Multiple state prison correctional officers testified they responded to a radio call regarding a fight between inmates. Each testified Perez and Mario Martinez[3] were attacking the victim. None of the officers observed any weapons during the altercation, and none knew how or why it began.

---

[1] Some of the issues raised on appeal concern the jury's true finding on using a deadly weapon. This finding was not an enhancement but rather a special finding by the jury after it reported it had reached a verdict. We do not address these issues because the disposition renders them moot.

[2] All statutory references are to the Penal Code.

[3] Martinez was tried and convicted as a co-defendant. He is not involved in this appeal.

2.

A subsequent search of the yard in which the altercation occurred revealed two "inmate-manufactured weapons." Medical personnel examined the victim and concluded he suffered multiple puncture wounds.

Martinez, Perez, and the victim each testified at the trial. The victim invoked his right against self-incrimination and refused to answer questions. Martinez testified he was defending himself and neither he nor Perez used a weapon. Martinez claimed Perez was attempting to break up the fight.

Perez's testimony was consistent with Martinez's testimony. He denied both assaulting the victim and possessing a weapon.

**Verdict and Sentence**

Perez was convicted as charged.[4] The jury also found true he personally used a deadly weapon.[5] He was sentenced to serve 26 years to life in prison.

## DISCUSSION

During jury selection, the court commented about the technical nature of jury instructions and offered an analogy to a dog's decisionmaking. It repeated the analogy, and described a second, during the post-evidence instructions preceding the jury's deliberations.

Perez complains the court's comments and analogies effectively undermined the People's burden of proof. The People claim the argument is forfeited and, alternatively, lacks merit. Specifically, the People argue Perez failed to object and "the court did not intend for the [voir dire] pet analogy to act as a substitute for formal jury instructions" and "these initial comments were made before the jury was sworn, and such comments are rarely viewed as a substitution for later formal instructions. [Citation.] Given the

---

[4] After the verdict was recorded, Perez admitted the prior conviction allegations were true.

[5] Again, this was not an enhancement.

early stage of the proceedings, it is not even clear that all of the eventually seated jurors were even privy to these initial comments. The court's comments never informed the jury that they should let a pet decide the case or that such pedestrian levels of certainty should guide resolution of the case. Rather, the court was merely making the innocuous point that decisions are made in everyday life, so the jury should not be afraid to make a decision in a criminal matter."

As for the post-evidence comment, the People suggest "the court's comments prior to deliberations did not lower the burden of proof. [Citation.] The court's comments merely continued with the innocuous theme that the jury should not be daunted by the language used in the instructions, and that people and animals make decisions every day. It is important to note that the trial court never told the jury that they could use their everyday decision-making standard in a criminal context."

The record belies the People's contentions. Although not all jurors heard the court's analogy during jury selection,[6] each juror heard the reiterated, more detailed version during the post-evidence instructions. As explained below, the analogy was given in context to aid understanding the instructions. We will reverse the judgment because the analogy impermissibly lowered the burden of proof.

**Additional Background**

Jury selection in this case involved multiple jury panels over several days. Each panel was instructed with the pattern reasonable doubt jury instruction. It reads as follows:

> "The fact that a criminal charge has been filed against the
> defendant[s] is not evidence that the charge is true. You must
> not be biased against the defendant[s] just because
> (he/she/they) (has/have) been arrested, charged with a crime,
> or brought to trial.

---

[6] The court separated the entire jury venire into multiple groups during jury selection. It appears at least two empaneled jurors were not in the group that heard the court's analogy during jury selection.

4.

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant[s] guilty beyond a reasonable doubt, (he/she/they) (is/are) entitled to an acquittal and you must find (him/her/them) not guilty."[7] (CALCRIM No. 220, CALCRIM No. 103.)

The reasonable doubt standard featured prominently throughout jury selection.

After the initial questions to the first panel were complete, the court remarked,

"I'm more and more convinced that the jury instructions that I will give you at the conclusion of the case are going to be, by and large, foreign to you. They're in technical language. They're designed to be understandable, but we deal with concepts that you as lay people don't normally address or discuss; but these kinds of concepts that we address and bring up in the instructions are important concepts. It's what our law is based upon. There has to be specificity to what we do, but I would suggest to you that by and large, a lot of these concepts I'll go over with you at a later time, and I may

---

[7] CALCRIM No. 103 is the pre-trial version of the reasonable doubt instruction generally read during jury selection and prior to opening statements. For clarity's sake, we quote the CALCRIM No. 220 pattern instruction verbatim, and not the words the trial court actually spoke. Any difference between the court's language and the pattern CALCRIM No. 220 instruction is immaterial.

discuss a couple of them now before we finish, pertain to things that we do intuitively on an everyday basis.

"There was some discussion of circumstantial evidence. We rely on circumstantial evidence, as been pointed out to you, every day of our lives when we drive to work. We probably don't give much thought to it, to making an analysis based upon direct versus circumstantial evidence, but it's something you're familiar with.

"Things like intent. Intent, oftentimes in a criminal case, becomes important. If it is, I'll give you an instruction on that, but we constantly evaluate the intent of the people that we are around. Our pets even evaluate our intent. My dog is able to figure out on a weekend when I'm going someplace and he has a good chance of going along because he'll be in front of the door. On the workweek he stays in his bed as I walk by. So he's been able to figure out something about me and my operation to understand what my intent is when I walk out the door.

"So these things aren't foreign concepts, but they are new concepts and that's why the attorneys spend some time discussing them with you. When I started out, I commented, I don't care if you like the law; I just want you to be able to follow the law. You as a juror has to be able to follow the law, not necessarily like it."

The court did not again read the reasonable doubt instruction until after the close of evidence.

In its concluding instructions, the court read the CALCRIM No. 220 reasonable doubt instruction outlined above. It then read instructions on evidence, direct and circumstantial evidence, sufficiency of circumstantial evidence, witnesses, and union of act and intent.[8] The court then commented,

"And usually it's about this point that I make a comment on some of the instructions I read and some of the instructions I'll give to you. But there's an old adage regarding the law.

---

[8] CALCRIM Nos. 222, 223, 224, 226, and 250, respectively.

For those of you who are engineers you might find it interesting or funny. But the adage is the law isn't based on logic. The law is based upon experience. Of course the law necessarily needs to be precise. But what I read to you and read on a regular basis, as the juries come in and the more I read them, the more I'm convinced that these instructions simply, in a very specific way, codify or express what all of us as humans experience.

"We all deal with evaluating the credibility of people around us and the TV commercials we listen to. We all determine the culpability of people around us, whether someone cut us off intentionally or someone bumped into us in the supermarket by accident. Even our pets make those determinations. If you stumble over it – there was an old writer back in the 1920s who made a comment one time – and he would report on criminal cases – that even the family dog knows the difference between a kick done in anger and a master stumbling over his pet. So even animals do that. My own dog can figure out when on weekends I'm going to go run an errand which he'll get invited on and during the week when I'll drive to work. And during the week, he doesn't get up from his bed by the door. On the weekend he's probably got an 80, 90 percent accuracy rate of when I'm going out the door of when he's gonna get a ride. It's not perfect because sometimes I'm actually going out to the garage to do something else. But he's able to determine my intent.

"So as I read these instructions to you, I encourage you not to be put off by them because they are not foreign topics. They are foreign only because of the formal language that we use in these because these instructions obviously must be specific. We can't just have general concepts of the law that we expect you to apply."

Thereafter, the parties completed closing arguments and the case was submitted to the jury.

**Analysis**

We first address the forfeiture issue. Then we turn to the claimed instructional error.

7.

## A. Forfeiture

"[F]ailure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected. [Citation.] Here, [Perez] claims that the flawed instructions deprived him of due process, and because this would affect his substantial rights if true, his claim is not forfeited." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579-580; § 1259.)**9**

## B. Instructional Error

"The federal Constitution's due process guarantee 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' [Citation.] The Constitution 'does not require that any particular form of words be used in advising the jury of the government's burden of proof,' but it does require that, ' "taken as a whole, the instructions … correctly conve[y] the concept of reasonable doubt to the jury." ' [Citation.] What matters … is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 839-840 (*Daveggio and Michaud*).)

"[T]he essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings." (*Sullivan v. Louisiana* (1993) 508 U.S. 275,

---

**9** We also note, " '[t]he fact that a party, by failing to raise an issue below, may forfeit the right to raise the issue on appeal does not mean that an *appellate court* is precluded from considering the issue. "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party …. Whether or not it should do so is entrusted to its discretion." ' [Citations.] Here, nothing less fundamental is at stake than the denial of [Perez's] due process protection 'against conviction except upon proof beyond a reasonable doubt.' " (*People v. Johnson* (2004) 119 Cal.App.4th 976, 984-985 (*Johnson*); *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 ["An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party."].)

281.)  In such a case, the error "compels reversal per se."  (*Johnson, supra,* 119 Cal.App.4th at p. 986; accord *People v. Reese* (2017) 2 Cal.5th 660, 668-669.)

Courts have long cautioned " 'modifying the standard instruction [on reasonable doubt] is perilous, and generally should not be done ….' "  (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 844.)  The core concern with analogizing the reasonable doubt standard to ordinary events is inadvertently communicating to jurors "sufficient confidence to make an ordinary or even important life decision" is proof "beyond a reasonable doubt."  (*People v. Potts* (2019) 6 Cal.5th 1012, 1040 (*Potts*).)

The court here, mindful of perilously modifying instructions, explained to jurors, "We can't just have general concepts of the law that we expect you to apply."  But it did so nonetheless by stating, "We all determine the culpability of people around us, whether someone cut us off intentionally or someone bumped into us in the supermarket by accident."  No matter the court's motivation, "jurors should not be instructed to convict based on the level of certainty needed to make decisions 'in the ordinary affairs of life.' " (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 841.)

The court also equated determining culpability to a "dog know[ing] the difference between a kick done in anger and a master stumbling over his pet."  The court even solemnized this example by crediting the point "to an old writer back in the 1920s who … would report on criminal cases ...."  Then, the court added a personal example regarding its own dog's "80, 90 percent accuracy rate of when I'm going out the door of when he's gonna get a ride."  "[S]uggesting a specific quantitative measure of reasonable doubt" is inappropriate.  (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1267-1268 (*Katzenberger*).)

The Supreme Court has twice recently addressed a judge's spontaneous comments on reasonable doubt.  In each case the Supreme Court found no error, but those cases are readily distinguishable and help illustrate the error in this case.

First, in *Potts, supra,* the trial court referenced a hypothetical scenario in which parents solve the mystery surrounding an eaten raspberry pie. (*Potts, supra,* 6 Cal.5th at p. 1039.) The Supreme Court stated, "The court did not communicate that if jurors had sufficient confidence to make an ordinary or even important life decision, then they had been convinced beyond a reasonable doubt. The court instead provided a commonly used court example of a fictional scenario and indicated that most parents would be able to reach a beyond-a-reasonable-doubt conclusion …." (*Id.* at p. 1040.)

The Supreme Court concluded the "brief, inartful pretrial reference to the reasonable doubt standard—a standard the court had already defined properly and would again define after the close of evidence," was not error. (*Potts, supra,* 6 Cal.5th at p. 1041.) In contrast, here the court's most damaging comments came *after* both evidence and defining reasonable doubt.

For a similar reason, this case is unlike *Daveggio and Michaud, supra.* There, the judge commented, "In a criminal case, the scales of justice start tipped in favor of the defense, because the defendants are presumed to be innocent. The burden the prosecution must meet is to bring those scales into balance and then substantially tip them in favor of the truth of the charges that were filed against the defendants." (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 838.) The Supreme Court did not find error because "the challenged comments were made before the jury had even been selected and several months before the trial began."[10] (*Id.* at p. 842.)

This case is different. Here, the most prejudicial comments came after evidence concluded and after reasonable doubt was last properly defined. That timing makes it far more likely the comments impacted the jury's deliberations. (Cf. *Daveggio and Michaud, supra,* 4 Cal.5th at p. 844 ["trial court's comments on the reasonable doubt

---

[10] The Supreme Court also noted the "use of the scales-of-justice metaphor thus did not evoke a simple preponderance inquiry." (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 843.)

standard several months before trial were such that they could [not] have had any impact on the jury's deliberations."].)

To be fair, the court here did not explicitly state ordinary life decisions are made beyond a reasonable doubt. But it nonetheless stated culpability is routinely determined on a daily basis. What matters is whether the jury could have understood culpability to mean guilt beyond a reasonable doubt. (See *Daveggio and Michaud, supra,* 4 Cal.5th at p. 840.) We believe the answer is yes, because culpability is readily understood to mean guilt.

The fact the court here read to jurors the reasonable doubt standard multiple times does not alter our view. The court's final words explaining reasonable doubt came *before* it intertwined "determin[ing] the culpability of people" with life's ordinary affairs. That entanglement was accompanied by vivid examples which likely left an "indelible impression" on jurors' minds. (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 842; cf. *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 [prosecutorial error in "suggesting the reasonable doubt standard is used in daily life" not cured by admonition "to read the instructions"].)

Finally, we are not persuaded by the People's argument the court's comments are better understood as an "innocuous point that decisions are made in everyday life, so the jury should not be afraid to make a decision in a criminal matter." After providing the grocery store and pet "culpability" examples, the court remarked, "I encourage you not to be put off by [the instructions] because they are not foreign topics. They are foreign only because of the formal language that we use in these because these instructions obviously must be specific." These remarks are consistent with an effort to translate the pattern

11.

reasonable doubt instruction, i. e., "proof that leaves you with an abiding conviction that the charge is true,"[11] into less formal language.[12]

Under these circumstances, we conclude " 'there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*Daveggio and Michaud, supra,* 4 Cal.5th at p. 840.) "[T]he court's tinkering with the statutory definition of reasonable doubt, no matter how well intentioned, lowered the prosecution's burden of proof below the due process requirement of proof beyond a reasonable doubt."[13] (*Johnson, supra,* 119 Cal.App.4th at p. 985.)

## **DISPOSITION**

The judgment is reversed.


SNAUFFER, J.

WE CONCUR:


MEEHAN, Acting P.J.


DE SANTOS, J.

---

[11] CALCRIM No. 220.

[12] It is true the prosecutor referenced the pattern reasonable doubt instruction multiple times in closing argument, including the "abiding conviction" language, after the court's analogy. But the prosecutor was careful to remind the jurors, "The judge gives you the law that you apply to the evidence." This could well have increased the likelihood the jurors understood the judge's additional comments as law.

[13] All remaining contentions are moot.