Filed 1/13/22  P. v. Johnson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>TED OBIE JOHNSON II,<br><br>        Defendant and Appellant. | F080477<br><br>(Super. Ct. No. BF172916A)<br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

        Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Ted Obie Johnson II took photographs of a 15-year-old girl while she was sleeping, and moved her clothes to expose her breasts and genital area as he did so. A jury convicted him of a lewd act upon a 14- or 15-year-old child (Pen. Code,[1] § 288, subd. (c)(1); count 1), unlawful possession of child pornography (§ 311.11, subd. (a); count 2), and annoying or molesting a child (§ 647.6, subd. (a)(1); count 3). The court sentenced defendant to an aggregate prison term of two years and defendant was also ordered to pay various fees, fines and assessments.

On appeal, defendant contends the court committed structural error in its oral instruction on reasonable doubt, requiring reversal. To the extent counsel was required to object to this error and failed to do so, he contends counsel was ineffective. He further contends he is entitled to have excess presentence custody credits applied against a $1,230 fine that was imposed pursuant to section 290.3.

We reject defendant's claim of instructional error on the merits and therefore do not reach his claim of ineffective assistance of counsel. However, as the People concede, defendant is entitled to have excess custody credits applied first to his period of parole and to have any excess credits remaining thereafter applied to the $1,230 fine. (§ 2900.5.) Accordingly, we will remand for the court to determine the proper allocation of defendant's excess custody credits. In all other respects, we affirm.

## FACTS

### I.      Prosecution Case

In July 2018, 15-year-old M.D. was living in her grandmother's home in Bakersfield. Also living in the home were M.D.'s grandmother; M.D.'s mother, L.D.; M.D.'s four younger siblings, including 10-year-old B.D.; L.D.'s uncle, Terry; defendant,

---

[1] Undesignated statutory references are to the Penal Code.

2.

who was related to L.D. through her former marriage; and defendant's girlfriend Sasha.[2] Thus, defendant and Terry were the only adult men living in the house. Defendant is "[B]lack" and Terry is "[W]hite."

On July 8, 2018, B.D. played a game on defendant's cell phone. B.D. sometimes used defendant's cell phone with his permission. Defendant's phone was protected with a passcode, which he always changed. B.D. did not know the passcode and defendant would input the code every time B.D. or the other children used the phone. Defendant did not let anyone use his phone without his permission.

While using defendant's phone on July 8, 2018, B.D. took a screenshot of the game she was playing. When she went to view the screenshot, she discovered "inappropriate" photographs of M.D. The photographs depicted M.D. asleep with her top pulled up to expose her breasts and her pants pulled down and to the side to expose her genital area. In three of the photographs, M.D. is depicted with a "[B]lack male."

B.D. showed the photographs to M.D. M.D. cried and was scared, and ran to show L.D. the photographs.[3] L.D. took a picture of the photographs with her own phone, then deleted them from defendant's phone. L.D. believed that one of the photographs showed defendant's hand. L.D. called the police a few hours later.

Police arrived at the residence that evening and found defendant in a bedroom, with the cell phone next to him. In a subsequent interview, defendant denied there was anything inappropriate on his phone other than pornographic websites, and denied taking inappropriate photographs or having knowledge of any such photographs on his phone. He further stated he had no issues with anyone in the home, including L.D. or her children.

---

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3] Based on the clothing she was wearing in the photographs, which was not her usual pajamas, M.D. believed the photographs were taken on or after July 4, 2018.

Police seized defendant's phone and eventually recovered the photographs of M.D. that L.D. had deleted.

## II.  Defense Case

Defendant's girlfriend Sasha testified that defendant rarely used his cell phone but let L.D.'s children and others in the household use it.  Defendant would input the passcode for the children or tell them the code.  According to Sasha, the children all knew defendant's cell phone passcode.

Sasha did not believe defendant took the photographs of M.D.  She did not believe the hand depicted in the photographs belonged to defendant because his hands were "beaten up," "ashy," and looked like those of a construction worker, whereas the hands in the photographs appeared to be smaller and more moisturized than defendant's.

A relative of defendant, and of L.D. through her former marriage, testified that L.D.'s children would typically answer defendant's cell phone.  The relative also testified that multiple other people lived in the home at various times and would come and go.

## III.  Other Evidence

The parties stipulated that L.D. engaged in an act of prostitution in 2017.  Defendant presented his hands for the jury to view in court.  A photograph was taken of defendant's hands in court and was admitted as an exhibit.

## DISCUSSION

## I.  Instructional Error

Defendant argues the trial court instructed the jury with an erroneous definition of reasonable doubt, thereby committing structural error requiring reversal.[4]  We conclude

---

[4] Defendant acknowledges he failed to object to the trial court's oral instruction and, to the extent we conclude the issue is forfeited, he argues his counsel was ineffective in this regard.  Because we address and reject defendant's claim on the merits (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 916 [acknowledging that a court may reach the merits of a claim of instructional error that potentially affect's a party's substantial rights]), we do not reach his argument that counsel was ineffective.

4.

there is no reasonable possibility the jury applied the court's misstatement of reasonable doubt in an unconstitutional manner. Accordingly, we conclude the misstatement does not constitute reversible error.

## A.    Additional Factual Background

Before instructing the jury, the court advised the jury that it could read along with the court on a screen in the courtroom where the written instructions appeared. The court also advised the jury that the same written instructions would be in the jury room.

The court orally instructed the jury on reasonable doubt pursuant to CALCRIM No. 220 as follows:

> "The fact that a criminal charge has been filed against the Defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime or brought to trial. A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.

> "The evidence need not eliminate all possible doubt because everything in life is open to some possible *or ordinary* or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty." (Italics added.)

The written instruction on reasonable doubt was substantially identical but omitted the reference to "ordinary" doubt:

> "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

> "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a

5.

reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because *everything in life is open to some possible or imaginary doubt.*

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (Italics added.)

The court also instructed the jury pursuant to CALCRIM No. 200, in relevant part, as follows:

"Members of the jury, I will now instruct you on the law that applies to this case. I will give you copies of the instructions to use in the jury room. The instructions that you receive may be printed, typed, or written by hand. Certain sections may have been crossed-out or added. Disregard any deleted sections and do not try to guess what they might have been. *Only consider the final version of the instructions in your deliberations.*" (Italics added.)

**B.    Analysis**

Defendant contends that the reference to "ordinary" doubt in the trial court's oral instruction had the effect of reducing the prosecution's burden of proof to a preponderance of the evidence. He therefore contends the misstatement constituted structural error requiring reversal. The People do not dispute that the reference to "ordinary" doubt was erroneous. Rather, the People argue that the correct, written instruction governs.

In both state and federal criminal proceedings, the due process clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364; accord, *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278 (*Sullivan*).) However, "the Constitution neither prohibits trial

courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.]  Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  [Citation.]  Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' "  (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 (*Victor*).)  Nonetheless, departures from the standard jury instructions and statutory language governing reasonable doubt "have repeatedly been struck down" for creating uncertainty and confusion.  (*People v. Garcia* (1975) 54 Cal.App.3d 61, 63; see *People v. Paulsell* (1896) 115 Cal. 6, 12.)

When a trial court instructs the jury with a misdescription of the burden of proof by suggesting a higher degree of doubt than is required for acquittal under the reasonable doubt standard, reversal is required.  (*Sullivan*, *supra*, 508 U.S. at pp. 277, 281; see *Cage v. Louisiana* (1990) 498 U.S. 39, 40-41, disapproved on another ground in *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73, fn. 4.)  Similarly, reversal is required when the trial court's instructions lower the prosecution's burden of proof by equating reasonable doubt with the standard people use to make ordinary decisions in their everyday lives.  (*People v. Brannon* (1873) 47 Cal. 96, 97; *People v. Johnson* (2004) 119 Cal.App.4th 976, 985-986 (*Glen*); *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1171-1172 (*Danny*).)

In a case alleging the jury instructions misdescribed the burden of proof, our task is to determine de novo whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner.  (*Victor*, *supra*, 511 U.S. at p. 5.)  Here, we conclude that there is no such reasonable likelihood as the instructions, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury.  (*Ibid*.)

Our Supreme Court has held that "[t]he risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke." (*People v. Mills* (2010) 48 Cal.4th 158, 200; accord, *People v. Grimes* (2016) 1 Cal.5th 698, 729.) Where a discrepancy exists in the written instructions and oral instructions, we give precedence to the written instructions, particularly where, as here, the jury is instructed its deliberations are to be governed by the instructions in their final form. (*Mills*, at p. 201; accord, *Grimes*, at p. 729; *People v. Phea* (2018) 29 Cal.App.5th 583, 606-607, fn. 18.) There is no dispute that the written instructions given in the instant case were correct.[5] Moreover, the written instructions were displayed on a screen for the jury during the reading of the oral instructions. The jurors also were given the correct written jury instructions for review in the jury room. The jury was instructed to disregard material that was crossed out or added to the written instructions and to "[o]nly consider the final version of the instructions in [their] deliberations." Based on the foregoing, we discern no reasonable likelihood the jury applied the court's oral misstatement regarding ordinary doubt or understood the instructions as a whole to require the prosecution to prove defendant's guilt to a standard less than beyond a reasonable doubt.

Defendant attempts to analogize his case to *Danny*, *supra*, 115 Cal.App.4th 1169, and *Glen*, *supra*, 119 Cal.App.4th 976, both of which found reversible error where, during jury selection, the trial court equated proof beyond a reasonable doubt with everyday decision-making in a juror's life. We find both cases distinguishable.

---

[5] The CALCRIM No. 220 instruction given here is based directly on section 1096, which provides, in relevant part: "Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

In *Danny*, the trial court "amplified on the concept of reasonable doubt" during jury selection by stating: " 'The burden is proof beyond a reasonable doubt. A doubt that has reason to it, not a ridiculous doubt, not a mere possible doubt. Because we all have a possible doubt whether we will be here tomorrow. That's certainly a possibility. We could be [killed] tonight. . . . [I]t's a possibility. It's not reasonable for us to think that we will [be killed tonight] because we plan our lives around the prospect of being alive. We take vacations; we get on airplanes. We do all these things because we have a belief beyond a reasonable doubt that we will be here tomorrow or we will be here in [the future]. . . . But we wouldn't plan our live[]s ahead if we had a reasonable doubt that we would, in fact, be alive.' " (*Danny*, *supra*, 115 Cal.App.4th at p. 1171.) The Court of Appeal concluded that "making decisions to take vacations and get on airplanes" could not be "equated to the level of conviction necessary for finding guilt [beyond a reasonable doubt] in a criminal case." (*Id.* at p. 1172.) Although the jury otherwise was properly instructed on reasonable doubt, the appellate court concluded the trial court's explanation during voir dire had the effect of "reduc[ing] the prosecution's burden to preponderance of the evidence" and thereby affected the defendant's substantial rights. Accordingly, reversal was required. (*Ibid.*)

Similarly, in *Glen*, the court during voir dire attempted to explain at some length the concept of reasonable doubt. (*Glen*, *supra*, 119 Cal.App.4th at pp. 979-983.) The court questioned one prospective juror regarding decisions to have children or attend college, leading the prospective juror to acknowledge some doubt involved in those decisions. (*Id.* at p. 979.) "The court authorized the prospective jurors to find [the defendant] guilty even if they were to have 'some doubt' about his guilt and characterized a juror who renders a guilty verdict with 'no doubt' about his guilt as 'brain dead.' " (*Id.* at p. 980.) The court also "equate[d] proof beyond a reasonable doubt to everyday decisionmaking in a juror's life" (*id.* at p. 981), explaining: " 'Everything you do, you can look at what's reasonable and possible, and . . . every decision you make . . . [is]

9.

based on . . . reason . . . . [T]hat's not a definition of reasonable doubt, but that's what we want you to bring to court with you, the same thing you use every day in making your decision[s]. . . . [F]igure out what happened beyond a reasonable doubt, not beyond all possible doubt. . . . [Y]ou are never going to know what . . . happened beyond all possible doubt. . . .' " (*Id.* at p. 982.) The trial court reiterated that "jurors are . . . simply to make the 'kind of decisions you make every day in your life.'. . . [¶] '. . . The thing that you're doing is [making the] kind of decisions you make every day in your life, figuring out what happened, whether the defendant is guilty or not guilty.['] [¶] 'That's the kind of thing . . . that you decide every day in your life.' " (*Id.* at pp. 982-983.) The court reiterated that "jurors who find an accused person guilty or not guilty engage in the same decisionmaking process they 'use every day. When you get out of bed, you make those same decisions.' " (*Id.* at p. 983.) Likewise, the prosecutor, during argument, "characterized a juror who could return a guilty verdict without 'some doubt' about [the defendant's] guilt as 'brain dead,' and equated proof beyond a reasonable doubt to everyday decisionmaking in a juror's life[.]" (*Ibid.*) As in *Danny*, the appellate court concluded the trial court's remarks lowered the prosecution's burden of proof. (*Glen*, at p. 985.) Although a correct instruction on reasonable doubt also was given to the jury, the appellate court nonetheless concluded the trial court's exploration of that standard constituted structural error requiring reversal. (*Id.* at p. 986.)

Defendant's reliance on *Danny* and *Glen* is unpersuasive. There is no factual comparison between the extensive alternative explanations of reasonable doubt offered by the trial courts in *Danny* and *Glen*, and the fleeting reference to "ordinary" doubt in the instant case. Again, the misstatement regarding "ordinary" doubt was made while the correct written instruction was displayed for the jury. The jury was instructed to consider the final version of the instructions in their deliberations. Neither the prosecutor nor defense counsel provided any argument that would contradict the court's written

instruction. Taken as a whole, the court's instructions correctly conveyed the concept of reasonable doubt to the jury.

We conclude there is no reasonable likelihood the jury applied the instructions in an unconstitutional manner, and we therefore reject defendant's claim of error.

## II. Excess Custody Credits

Defendant was sentenced to an aggregate term of two years in state prison, the equivalent of 730 days. The court awarded defendant 977 days of custody credits and noted that his two-year sentence was served in full. The court imposed various fines, fees, and assessments, including a $300 fine and $930 penalty assessment (for a total of $1,230) pursuant to section 290.3. The court ordered defendant to report to the parole office within five days of his release from custody.

Defendant contends he is entitled to have his 247 days of excess custody credits applied against the $1,230 fine at a rate of $125 per day. The People concede defendant had 247 days of excess custody credits, but contend these first must be applied to reduce his period of parole before any excess credits may be applied against the fine.

The People are correct. Defendant's excess custody credits first must be applied to reduce his remaining period of parole, if any, and then to reduce his $1,230 fine. (§ 2900.5, subds. (a), (c); accord, *People v. Morales* (2016) 63 Cal.4th 399, 406 [noting, pursuant to § 2900.5, that excess custody credits "can reduce or eliminate the period of parole"].) We will remand with instructions for the court to determine the appropriate application of defendant's excess custody credits pursuant to section 2900.5.

## DISPOSITION

We remand with instructions for the trial court to determine the appropriate application of defendant's 247 days of excess custody credits. In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SNAUFFER, J.